AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

<div style="border:1px solid">

**FILED**

Mar 24, 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

</div>

| | |
|---|---|
| In the Matter of the Search of ) | |
| A Western Digital hard drive with serial ) | |
| number WMC4MOFO9P5J (forensic image), ) | Case No.    2:23-sw-0298 DB |
| CURRENTLY LOCATED AT the IRS-CI ) | |
| Oakland Field Office, located at 1301 Clay ) | |
| Street, Oakland, California ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

## SEE ATTACHMENT A-4, attached hereto and incorporated by reference.

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

## SEE ATTACHMENT B, attached hereto and incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1956(a)(2)(B)(i), (a)(3), (h) | International money laundering; money laundering sting; conspiracy |

The application is based on these facts:

## SEE AFFIDAVIT, attached hereto and incorporated by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_/s/ Brandon Yenter_
*Applicant's signature*

Brandon Yenter, Special Agent, IRS-CI
*Printed name and title*

Sworn to me and signed telephonically.

Date:   03/24/2023

City and state:  Sacramento, California

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Brandon Yenter, a Special Agent of the Internal Revenue Service-Criminal Investigation (IRS-CI), being duly sworn, hereby declare as follows:

## I.  BACKGROUND AND EXPERIENCE OF AGENT

1.     I am a Special Agent with IRS-CI and have been employed by IRS-CI since June 2018.  My current duties as an IRS-CI Special Agent include the investigation of possible criminal violations of the Internal Revenue laws (Title 26, United States Code), the Bank Secrecy Act ("BSA") (Title 31, United States Code), the Money Laundering Control Act of 1986 (Title 18, United States Code, specifically section 1956), and other related criminal offenses.

2.     I graduated from the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in criminal and financial investigative techniques with an emphasis in accounting, criminal tax law, money laundering, and BSA violations.  As part of this training, I also received specialized instruction in the areas of criminal investigative techniques, search and seizure, federal income tax law, and the detection and investigation of fraudulent tax refund schemes.

3.     I previously worked as a Federal Law Enforcement Officer for the Department of Homeland Security, where I enforced federal, state, and local laws.  I have also served in both enlisted and officer capacities in United States Air Force Special Warfare before becoming employed by IRS-CI.

4.     I hold a Bachelor of Science degree in Technical Management from Embry-Riddle University and a Master of Business Administration with a concentration in Finance from Louisiana State University, Shreveport.

5.     I have investigated or assisted in multiple investigations targeting various organizations involved in laundering fraudulently obtained proceeds domestically and

internationally.  I have analyzed financial records and other information relating to violations of money laundering statutes and the BSA committed by various drug trafficking organizations.

6.     Based on the facts set forth below, I believe that Ramon Robledo GARCIA's electronic devices described in Attachments A-1 through A-4 contain evidence of his crimes related to money laundering in violation in 18 U.S.C. Sections 1956(h) (money laundering conspiracy) and 1956(A)(3) (sting provision).  GARCIA was arrested on February 28, 2023, pursuant to a federal arrest warrant for violations of 18 U.S.C. 1956 (A)(3).  On the same day, agents executed federal search warrants issued for, among other places, 4600 Tudor Rose Glen, Stockton, California (hereinafter "GARCIA's residence") and GARCIA's business, EL RINCONCITO, located at 310 E. Pine Street, Lodi, California.

## II.  <u>SCOPE OF REQUESTED WARRANTS</u>

7.     I write this affidavit in support of an application for rollover warrants to search electronic devices, which were seized pursuant to searches authorized by previous search warrants, and which are further described in Attachments A-1 through A-4.  (The affidavit requesting the seizure of these electronic devices is attached hereto as Attachment C.[1])  The searches of these electronic devices would aim to identify electronically stored data related to violations of Title 18 U.S.C. § 1956(A)(3) (Money Laundering – Sting Provision) and Title 18 U.S.C. § 1956(h) (Money Laundering –

---

[1]  I have attached as Exhibit C a copy of the complaint that was approved and filed in this case. (Although the complaint in this case was initially filed under seal, the complaint was subsequently unsealed so that GARCIA could make his initial appearance on the complaint.  *See* Case No. 2:23-mj-0030 DB, Dkt. Nos. 1, 5.)  The affidavit supporting that complaint is identical to the affidavit submitted in support of the search warrants requesting to search both GARCIA's residence and his business, EL RINCONCITO.  The court authorized those two search warrants in Case Nos.: 2:23-sw-0189 DB (GARCIA's residence) and 2:23-sw-0190 DB (EL RINCONCITO business).  For purposes of judicial economy, I have not attached each of the individual search warrants to the present affidavit.

Conspiracy).  That electronically stored data is more specifically described in Attachment B.  Attachments A-1, A-2, A-3, A-4, B, and C are fully incorporated herein by reference.

8.      The electronic devices to be searched pursuant to the present warrant request are as follows:

1.  **Attachment A-1:**  A Chromebook computer, described as a silver in color computer with no visible serial number that was seized at the residence of GARCIA, who is the target of the government's money laundering investigation.  I will refer to this Chromebook in this affidavit as the "Residential Electronic Device."

2.  **Attachment A-2:**  An HP Envy Desktop computer with serial number 2MOJ1383JJ (forensic image), which was seized at EL RINCONCITO, the money service business used by GARCIA to launder money.

3.  **Attachment A-3:**  An NXT USB thumb drive with serial number YP212 (forensic image), which was seized at EL RINCONCITO.

4.  **Attachment A-4:**  A Western Digital hard drive with serial number WMC4MOFO9P5J (forensic image), which was seized at EL RINCONCITO.

9.      The electronic devices seized at EL RINCONCITO (*i.e.*, the devices described in Attachments A-2 through A-4) are collectively referred to in this affidavit as the "Business Electronic Devices."  Pursuant to the aforementioned search warrant (2:23-sw-0190 DB), these Business Electronic Devices were forensically imaged offsite by IRS-CI and returned to the business the day after the execution of the search warrant.  As described in greater detail in Attachment C (*see* Paragraphs 149–152), generally speaking, "imaging" is the taking of a complete electronic picture of a computer's data in order to ensure that the information seized is complete and accurate, and to prevent the

loss of data either from accidental or intentional destruction.  Here, and as authorized by the previous search warrant, the Business Electronic Devices were imaged and then returned to the business to minimize the impacts caused by the search warrant and to allow EL RINCONCITO to continue its normal, legitimate business operations.

10.     The Residential Electronic Device and Business Electronic Devices (collectively "Devices") are currently in the lawful possession of the Drug Enforcement Administration and Internal Revenue Service – Criminal Investigation, respectively.  The Devices were seized as authorized in the search warrants described above.  Because these Devices are already in the lawful possession of DEA and IRS-CI, law enforcement may already have all necessary authority to examine the Devices.  However, I seek these additional warrants out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

11.     The Residential Electronic Device is currently located at the DEA Sacramento District Office located at 4328 Watt Avenue, Sacramento, California.  The Business Electronic Devices are currently located at the IRS-CI Oakland Field Office, located at 1301 Clay Street, Oakland, California.  In my training and experience, I know that these Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the DEA and IRS-CI.

12.     As described in more detail below, I am currently conducting an investigation related to the laundering of criminally derived drug proceeds to Mexico.  The investigation involves the owner of the Residential Electronic Device, GARCIA, as well as GARCIA's money service business, EL RINCONCITO, which is where the Business Electronic Devices were found.  Both GARCIA's residence and his business are located in the Eastern District of California.

13.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

### III.  **PROBABLE CAUSE**

14.     The United States Department of Justice, Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), and local law enforcement have been investigating a drug trafficking organization located within the Eastern District of California and elsewhere.  As part of this investigation, partnering agencies identified Juan Jose Valenzuela-Bustamante (Valenzuela) as a drug trafficker who uses Ramon GARCIA, and his Money Service Business (MSB), EL RINCONCITO to move cash drug proceeds from the United States to Mexico.

15.     On December 9, 2021, Valenzuela was arrested on a federal search warrant for violations of 21 U.S.C. § 846, conspiracy to distribute controlled substances.  During the arrest, agents identified two cellular devices belonging to Valenzuela, one of which contained approximately 50 images containing EL RINCONCITO wire remittance receipts totaling approximately $95,100, dated between November 5, 2021, and December 8, 2021.  These images appeared to be photographs taken of wire remittance receipts that the wire transactions had been successfully completed and of a computer screen, which indicates that GARCIA was using a computer device to process the transactions and print the receipts for his illegal money laundering transactions.

16.     To further investigate the allegations of GARCIA's money laundering activities, IRS-CI and partnering agencies conducted a total of seven undercover operations between May 16, 2022, through October 7, 2022.  Throughout the undercover operations, GARCIA laundered approximately $70,000
in total of government funds,[3] which were represented to GARCIA to be illegally derived.  Moreover, as with the earlier transactions involving Valenzuela, for each of the money laundering transactions conducted as part of the government undercover operations, GARCIA would take photos of what appeared to be printed paper wire

---

[2] The approximate total of $70,000 includes the money transferred plus the Western Union fees and GARCIA's money laundering fees.

remittance receipts that suggests he had used an electronic device to complete the requested money laundering transactions.  *See, e.g.*, Attachment C, ‖‖ 77–81.

17.    Based on these investigation activities, the government sought federal search warrants for GARCIA's residence and business, an arrest warrant, and a criminal complaint.  The affidavit supporting these documents can be read in full in Attachment C.

18.    On February 23, 2023, the Honorable Magistrate Judge Deborah Barnes issued an arrest warrant and criminal complaint against GARCIA for violations of Title 18 U.S.C. § 1956(A)(3) (Money Laundering – Sting Provision) (Attachment C).  On this same day, Judge Barnes issued search warrants for, among other things, GARCIA's residence and his EL RINCONCITO business.

19.    On February 28, 2023, IRS-CI and partnering agencies executed those federal warrants, resulting in GARCIA's arrest, as well as the seizure of certain items authorized by the previously issued warrants.

20.    More specifically, during the search of GARCIA's residence, agents discovered a Chromebook (Attachment A-1) in the residence's master bedroom.  As relevant to the present warrant request, agents also seized from GARCIA's residence:  bank statements from the Bank of Stockton, Golden 1 Credit Union, and Wells Fargo Bank; EL RINCONCITO business payroll records; property tax and expense receipts; and personal and business tax preparation records.  Many of these records appeared to be computer generated and appeared to have been printed from the Residence Electronic Device.  Among these documents, there were several documents that did not contain folds or creases and/or that had ink blemishes and smears, which suggests that some of these documents were created by a non-commercial, home-based printer and had not been mailed.  Because these documents had been computer generated and/or appeared to have been printed by the Residential Electronic Device, law enforcement has probable cause to believe that GARCIA used the Residential Electronic Device to store and/or prepare financial documents that may be directly relevant to his money laundering offenses.

21.     What's more, as described in greater detail in Attachment C (*see, e.g.*, Paragraphs 9–14, 147), I know based on my training and experience that individuals involved in money laundering activities frequently maintain records related to these activities at their residences and on electronic devices.  This training and experience, along with the items described above that were located at GARCIA's residence, establishes probable cause to believe that the Residential Electronic Device contains evidence of GARCIA's illicit activities, including the items described in Attachment B.

22.     Also on February 28, 2023, IRS-CI and partnering agencies executed the search warrant at EL RINCONCITO, where the Business Electronic Devices (Attachments A-2, A-3, and A-4) were located.  At the business, agents also seized money transfer receipts, tax related documents, banking records, property ownership, and MSB- and compliance-related material.  Many of these seized items appeared to be computer generated.

23.     Maricela Mesino Gonzalez (Gonzalez)—who is GARCIA's wife, and who works at EL RINCONCITO—was interviewed at EL RINCONCITO during the execution of the search warrant.  Gonzalez stated that EL RINCONCITO's employees use computers to complete their training before they would be able access the wire remitter systems. Gonzalez also indicated that EL RINCONCITO maintains its records and related bookkeeping records using a computer software program called QuickBooks.  Gonzalez also indicated that payroll is submitted by Gonzalez from a computer onsite to ADP for processing.

24.     Additionally, GARCIA told agents that EL RINCONCITO's employees completed annual BSA, and Anti-Money Laundering (AML) training using computers and filed Currency Transaction Reports (CTRs) for any transaction over $10,000.  Based on my training and experience, a bank or financial institution, like an MSB, must electronically file a Currency Transaction Report (CTR) for each transaction in currency (deposit, withdrawal, exchange of currency, or other payment or transfer) of more than

$10,000 to the Financial Crimes Network (FinCEN).  These electronic filing of CTRs is typically conducted using the business's computers.

25.    Based on this information, along with the information uncovered as part of law-enforcement's earlier investigation (which indicated that GARCIA used computers at his EL RINCONCITO business from as early as April 2018 to launder drug proceeds and/or purported drug proceeds to Mexico, *see, e.g.*, Attachment D, ¶¶ 41–49), law enforcement has probable cause to believe that the Business Electronic Devices contain evidence of GARCIA's money laundering activities.

## IV. ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

27.    There is probable cause to believe that things that were once stored on the Devices may still be stored there, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently

being used by an active file-for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

28.   Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information

such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about when the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29.  <u>Nature of examination</u>.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the device

consistent with the warrants.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrants.

30.   <u>Manner of execution</u>.  Because these warrants seek only permission to examine Devices already in law enforcement's possession, the execution of these warrants does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

# V. <u>CONCLUSION</u>

31.   Based on my training and experience, I know it is common for personal and business-related financial records (i.e., bank statements, investment accounts, ledgers, etc.). along with related communications (i.e., emails, messages, etc.) to be stored on electronic devices.  These records can contain records of legally and illegally derived income, which can both further the investigation and determine the scope of GARCIA's illicit activity.  Furthermore, this electronically stored evidence can contain evidence that is directly linked to the criminal scheme, such as, ledgers of money laundered, names used in the scheme to conceal the source of funds, and money sent for other co-conspirators.  It has been my experience that individuals typically store related electronic evidence on personal and business computers and other electronic storage devices.  Indeed, in this case, law enforcement found that GARCIA uses his electronic devices (*e.g.*, his cell phone) to take pictures of wire remittance transactions completed in violation of the federal money laundering statutes.

32.   Additionally, Gonzalez confirmed that EL RINCONCITO uses computers to train employees, maintain bookkeeping records, and process payroll records. Based on my training and experience, this information can be used to reconstruct income derived from legitimate and illegitimate activity.  Thus, analyzing this electronically stored information

will further the investigation and uncover additional evidence of GARCIA's crimes by, for example, determining assets purchased through ill-gotten gain. Furthermore, the statements provided by Gonzalez support my training and experience indicating that the computers seized at EL RINCONCITO will contain training records. These training records amount to evidence of criminal activity, because they can show that GARCIA and EL RINCONCITO's employees had knowledge of applicable Anti-Money Laundering (AML) and Bank Secrecy Act (BSA) laws, and thus their decision to nevertheless launder money in contravention of these laws was done with knowledge.

33.   For the foregoing reasons, and for the additional reasons more fully described in Attachment C, I believe there is probable cause to believe that the Residence Electronic Device and Business Electronic Devices contain evidence of violations of Title 18 U.S.C. § 1956(A)(3) (Money Laundering – Sting Provision) and Title 18 U.S.C. § 1956(h) (Money Laundering – Conspiracy) dating back to at least April 2018.

[NOTHING FOLLOWS ON THIS PAGE]

# VI. <u>AUTHORIZATION REQUEST</u>

34.     Based on the foregoing, and pursuant to Federal Rule of Criminal Procedure 41, I request that the Court issue the proposed search warrants to authorize the search of the electronic devices more particularly described in Attachments A-1 through A-4, for the items described in Attachment B.

/s/ Brandon Yenter
_____
BRANDON M. YENTER
Special Agent
Internal Revenue Service-Criminal Investigation

Subscribed and sworn to me telephonically
this ____24____ day of March, 2023.

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

Reviewed and approved as to form

_____
AARON D. PENNEKAMP
Assistant United States Attorney

## ATTACHMENT A-1

### DESCRIPTION OF PROPERTY TO BE SEARCHED

A Chromebook computer, described as a silver in color computer with no visible serial number that was seized at the residence of Ramon Robledo GARCIA on February 28, 2023, hereinafter the "Device."  This Device is currently located at the DEA Sacramento District Office located at 4328 Watt Avenue, Sacramento, California.


This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## <u>ATTACHMENT A-2</u>

### DESCRIPTION OF PROPERTY TO BE SEARCHED

An HP Envy Desktop computer with serial number 2MOJ1383JJ (forensic image), which was seized at EL RINCONCITO on February 28, 2023, hereinafter the "Device."  The Device is currently located at IRS-CI Oakland Field Office, located at 1301 Clay Street, Oakland, California.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A-3

**DESCRIPTION OF PROPERTY TO BE SEARCHED**

An NXT USB thumb drive with serial number YP212 (forensic image), which was seized at EL RINCONCITO on February 28, 2023, hereinafter the "Device."  The Device is currently located at IRS-CI Oakland Field Office, located at 1301 Clay Street, Oakland, California.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A-4

### DESCRIPTION OF PROPERTY TO BE SEARCHED

A Western Digital hard drive with serial number WMC4MOFO9P5J (forensic image), which was seized at EL RINCONCITO on February 28, 2023, hereinafter the "Device."  This item is currently located at IRS-CI Oakland Field Office, located at 1301 Clay Street, Oakland, California.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

## ITEMS TO BE SEIZED

The items to be searched and seized from the property described in Attachments A-1, A-2, A-3, and A-4 include evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1956(a)(2)(B)(i) (International Money Laundering), 18 U.S.C. § 1956(a)(3) (Money Laundering Sting Provision), and/or 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) committed by Ramon Robledo GARCIA and/or his co-conspirators from April 2018 to the present, specifically identified as follows:

1. Electronic documents, records, or correspondence to and/or from actual or prospective customers reflecting communications with, and the operations of, drug traffickers.

3. Electronic diaries, calendars (whether conventional or electronic), appointment books, journals address/telephone books (such as an address/telephone rolodex or similar index), and business cards associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

4. Customer files and lists associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering, which are related to the check cashing and/or transfer or transmission of money, including records with the following types of information: customer names, addresses, and phone numbers; amount of money transferred; type of check cashed; check payee and payor information (e.g., name, address, social security number, telephone number and driver's license number); commission or payments received from customers related thereto.

5. Compliance training records, training of employees on SAR, CTRs and BSA requirements, internal audit files, internal investigation files, training records on AML, and any wire service agent onboarding due diligence documentation.

6. Sender's money transfer receipt (to include any sender's name, address, telephone number, social security number, date sent, amount sent, fee charged, expected payout location and the recipient's name), recipient's money transfer receipt (to include any recipient's name, address, telephone number, social security number and amount received), to include any identification used to send wires.

7. Bank records, credit card account records, brokerage account records, investment records, financial institution records and any other records reflecting the potential receipt of income, transfer of assets or expenditure of income, documents related to the ownership or purchase of real property, documents relating to the purchase of durable goods or luxury items, including vehicles, jewelry and appliances which are associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

8. Electronic records or keys related to the use of any safe deposit boxes.

9. Electronic documents or records of financial transactions or instruments, travelers' checks, bonds, stock certificates, wire transfers, money orders, cashier's checks, passbooks, bank checks, bank statements, credit card statements, bank deposit tickets, certificates of deposits, income tax returns, memoranda, and other records which are associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

11. Photographs, videos, and any video or audio recordings pertaining to assets obtained with narcotics proceeds.

12. Electronic records, documents, and materials showing control, possession, custody, dominion, or other indicia of occupancy over the premises or digital media found in the premises, specifically, personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties, keys, or photographs (developed or undeveloped).

13. Personal telephone and address books and listings, letters, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, shipping materials or records, which are associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

14. Records accounting for the remittance of drug proceeds, for example, accounting books, receipts, purchase orders, notes, ledgers, notebooks, computer spreadsheets, and "pay/owe sheets".

15. Electronic communications devices relating to any conspiracy to launder money or money laundering activities.  Specifically, this includes records of telephone calls, text messages, WhatsApp messages, SMS messages, picture messages, electronic messages, application information, and voicemails stored within the electronic device, contact lists and phonebook, recent call activity, electronically formatted personal notes, photographic or video images, audio recordings, or records of appointments and/or reminders annotated on a calendar relating to the above-mentioned violations.

16. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**ATTACHMENT C**

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| RAMON ROBLEDO GARCIA | ) |
| | ) |
| | ) |
| | ) |

Case No.  **2:23-mj-0030 DB**

**FILED**

**Feb 23, 2023**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ May to October 2022 _____ in the county of _____ San Joaquin _____ in the
_____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| **18 U.S.C. § 1956(a)(3)** | **Money Laundering Sting Provision** |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
/s/ Brandon Yenter
_Complainant's signature_

Brandon Yenter, Special Agent,
United States IRS-CI
_Printed name and title_

Sworn to me and signed via telephone.

Date: _____ February 23, 2023 _____

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

City and state: _____ Sacramento, California _____

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT, SEARCH WARRANTS, AND ARREST WARRANT

I, Brandon Yenter, a Special Agent of the Internal Revenue Service-Criminal Investigation (IRS-CI), being duly sworn, hereby declare as follows:

## I.  BACKGROUND AND EXPERIENCE OF AGENT

1.      I am a Special Agent with IRS-CI and have been employed by IRS-CI since June 2018.  My current duties as an IRS-CI Special Agent include the investigation of possible criminal violations of the Internal Revenue laws (Title 26, United States Code), the Bank Secrecy Act ("BSA") (Title 31, United States Code), the Money Laundering Control Act of 1986 (Title 18, United States Code, specifically section 1956), and other related criminal offenses.

2.      I graduated from the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in criminal and financial investigative techniques with an emphasis in accounting, criminal tax law, money laundering, and BSA violations.  As part of this training, I also received specialized instruction in the areas of criminal investigative techniques, search and seizure, federal income tax law, and the detection and investigation of fraudulent tax refund schemes.

3.      I previously worked as a Federal Law Enforcement Officer for the Department of Homeland Security, where I enforced federal, state, and local laws.  I have also served in both enlisted and officer capacities in United States Air Force Special Warfare before becoming employed by IRS-CI.

4.      I hold a Bachelor of Science degree in Technical Management from Embry-Riddle University and a Master of Business Administration with a concentration in Finance from Louisiana State University, Shreveport.

5.      I have investigated or assisted in multiple investigations targeting various organizations involved in laundering fraudulently obtained proceeds domestically and internationally.  I have analyzed financial records and other information relating to violations of money laundering statutes and the BSA committed by various drug trafficking organizations.

6.      Based on my training and experience I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income.  These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "fronts" in an attempt to legitimize and conceal their activities, and the use of "international" banking in an attempt to break a financial paper trail.  These and other schemes involving the movement and concealment of criminal proceeds are commonly referred to as "money laundering."

7.      I have also had extensive experience in debriefing defendants, participant witnesses, informants, and other persons who have had personal experience and knowledge of the amassing, spending, converting, transporting, distributing, and concealing of proceeds from illegal activities.

8.      From training and experience I know that individuals normally maintain records of their financial activity in their residence, including receipts for expenditures by cash and check, bank records, and other financial documents. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business and often use accountants to complete financial statements and tax returns for their business and personal returns.

9.      From my training, experience, and discussions with experienced law enforcement officers, I know that it is common for individuals who are running businesses (whether lawful businesses, wholly illicit businesses, or lawful

businesses which commit unlawful activities related thereto) to maintain records related to the businesses and their activities including, but not limited to, customer files and lists related to the services or product provided; records and/or documents memorializing the sale/distribution of their product or the providing of services; records and/or documents provided to customers in connection with the services or product; correspondence to and/or from actual or prospective customers; records and/or documents reflecting or related to the purchase of equipment, materials, or supplies for the operation of the business; records and/or documents of mailings, shipping, or delivery, whether by the United States Postal Service or other private delivery services; personnel and payroll/commission records for all employees that appear to be engaged in the business; business or personal records related to the receipt, transfer, and expenditure of income received from the business; bank records, credit card account records, brokerage account records, investment records, financial institution records, and any other records reflecting the receipt of income, transfer of assets, or expenditure of income produced by the business; and other records and/or documents which appear to be related to the business including, but not limited to, notes, internal correspondence, external correspondence, memoranda, directives, and organizational charts.

10.    From my training and experience, I know that individuals normally maintain records of their financial activity in their residence or business locations, including receipts for expenditures by cash and check, bank records, and other financial documents.  In addition, I know that transference of these items between locations is common and fluid with seemingly personal financial records found in a business setting and business records brought into the home.  This practice has become commonplace as more industries have been found conducive to a work at home arrangement.  Persons engaged in fraud and/or money laundering often maintain such records for long periods of time, particularly when they are involved in ongoing criminal conduct over a long period of time.

11.     There are many reasons why criminal offenders maintain evidence for long periods of time.  First, to the offender, the evidence may seem innocuous at first glance (e.g. financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software).  To law enforcement, however, such items may have significance and relevance when considered in light of other evidence.  Second, the individual may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence.  The individual may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed computer-related evidence, which in fact, may be retrievable by a trained forensic computer expert.

12.     From my training and experience, I know that individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc.  Records of such instruments are oftentimes maintained at the individual's residence or place of business.

13.     Based on my training and experience, individuals who have accumulated wealth and assets will maintain those records as long as they own the assets and even after the asset has been disposed.  I have observed persons who are attempting to conceal ownership of assets which are the fruits of a crime by directing correspondence to mailboxes or other addresses not directly connected

to them.  Furthermore, I have seen individuals place ownership of assets under the control of others or under entities to conceal the true ownership.

14.     Similarly, from my training and experience, I know that individuals involved in illegal activities frequently store evidence of their illegal activities in rooms and areas of their residences and/or businesses that appear to belong to, are controlled by, and/or are accessible to other occupants of the premises, including for example, bedrooms belonging to children, other family members, or roommates, or offices belonging to employees or co-workers in an effort to conceal the evidence from law enforcement and to disguise their ownership and control of the evidence in the event that it is seized.  This warrant therefore seeks permission to search the entire premises for which the warrant is sought, including any location where there is reasonable cause to believe the items listed in Attachment B may be found.  *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."); *United States v. Ross*, 456 U.S. 798, 820–21 (1982) ("A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search.  Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."); *see also United States v. Adjani*, 452 F.3d 1140, 1146 (9th Cir. 2006) ("Although individuals undoubtedly have a high expectation of privacy in the files stored on their personal computers, we have never held that agents may establish probable cause to search only those items owned or possessed by the criminal suspect.  The law is to the contrary.") (citing *Zurcher*); *United States v. Tehfe*, 722 F.2d 1114, 1118 (3d Cir. 1983) ("Property owned by a person absolutely innocent of any wrongdoing may nevertheless be searched under a valid warrant.") (cited with approval in *Adjani*).

15.     I have personally participated in the investigation of the offenses discussed below.  I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation; (b) reports made to me by other law enforcement authorities; (c) reports and memoranda of interviews I have reviewed; (d) records subpoenaed by a federal grand jury; and (e) other sources of information as stated herein.  However, I have not set forth every fact that I know of that is relevant to this investigation.  Rather, I have set forth only the facts necessary to establish probable cause for purposes of obtaining the requested criminal complaint, search warrants, and arrest warrant.

## II.  NATURE OF APPLICATION

16.     I make this affidavit in support of the issuance of a criminal complaint, search warrants, and an arrest warrant.  Specifically:

17.     **Search Warrants:**  I present this affidavit to secure search warrants to search and seize evidence more particularly described in Attachment B (which is attached hereto and fully incorporated herein), located in or on the following places to be searched as more fully described in Attachments A-1 through A-4 (which are also attached hereto and fully incorporated herein):

- **Attachment A-1:  4600 Tudor Rose Glen, Stockton, CA (SUBJECT RESIDENCE):**  As described in more detail below, this is the residence of RAMON ROBLEDO GARCIA, who is the target of this investigation.  GARCIA repeatedly arranged to do in-person meetings in support of his money laundering activities near this residence, and he traveled to/from this residence immediately before and after these in-person meetings.
- **Attachment A-2:  301 E. Pine Street, Lodi, CA (EL RINCONCITO BUSINESS LOCATION):**  As described in more detail below, this is

the location for GARCIA's money service business, which GARCIA uses to illegally transfer money purported to be drug proceeds to Mexico.

- **Attachment A-3:  Phone of RAMON ROBLEDO GARCIA, which is assigned call number (209) 430-2095:**  As described in more detail below, this is the cell phone used by GARCIA to facilitate his money laundering activities.  For example, GARCIA used this phone to arrange in-person meetings with purported drug traffickers seeking to send money to Mexico, and this is the phone GARCIA used to send pictures of receipts showing that he had successfully sent money to Mexico on the purported drug traffickers' behalf.

- **Attachment A-4:  2014 GMC Sierra 1500 (VIN 3GTP1TEC2EG538654):**  As described in more detail below, GARCIA used this GMC Sierra to travel to/from in-person meetings with drug traffickers and/or purported drug traffickers for the purposes of collecting money to send to Mexico, discuss potential drug transactions, and introduce purported drug traffickers to other individuals involved in distributing controlled substances.

18.     I submit that there exists probable cause to believe that now located within the above listed items and locations are evidence, fruits, and/or instrumentalities of criminal offenses against the Unites States, to wit, violations of 18 U.S.C. § 1956(h) (Money Laundering Conspiracy) and 18 U.S.C. § 1956(a)(3) (Money Laundering Sting Provision).

19.     **Complaint & Arrest Warrant:**  Finally, I make this affidavit in support of a complaint and arrest warrant charging RAMON ROBLEDO GARCIA (GARCIA) with violations of 18 U.S.C. § 1956(a)(3) (Money Laundering Sting Provision).  In short, the facts establish below that between May and October 2022, in the

Eastern District of California, GARCIA agreed to launder proceeds purported to be from illegal activity in a series of undercover operations using EL RINCONCITO, his money service business ("MSB"), which used wire remittances to launder funds abroad in violation of federal law.  Moreover, the facts below establish probable cause that GARCIA's illegal money laundering activities began well before May 2022.  For example, law enforcement has identified evidence containing images of EL RINCONCITO wire remittance receipts stored in a known drug trafficker's phone dating back to November 2021. Additional evidence from this same phone shows that multiple text messages containing names were sent by the drug trafficker to GARCIA's phone in December 2021.  On the following day, GARCIA's phone sent the drug trafficker several text messages containing images of wire remittance receipts, many of which used the same names earlier provided as beneficiaries.  Consistent with this apparent money laundering activity, law enforcement has reviewed subpoenaed records showing that GARCIA has repeatedly used false "sender" names and/or drug-trafficker-linked "recipient" names for wire transactions to Mexico dating back to at least April 2018.

20.     The following information is based on my personal training, experience and observations, analysis of both public and subpoenaed documents, the use of related search warrants, undercover operations, and surveillance.  The purpose of this affidavit is to set forth probable cause to obtain search/seizure/arrest warrants and file a criminal complaint.  Again, I have not included herein every fact known to me in connection with this investigation.

### III.  **APPLICABLE CRIMINAL LAWS**

### A.  **CURRENCY TRANSACTION REPORTING REQUIREMENTS**

21.     Pursuant to Title 31, U.S.C. § 5313, and regulations thereunder, including 31 C.F.R. §§ 103.22, 27 and 28, financial institutions are generally required to

prepare and submit Currency Transaction Reports (CTRs) to report large cash transactions, consisting of transactions involving over $10,000 in currency or other monetary instruments, every time they occur at the financial institution. There are some exceptions from this filing requirement when dealing with government agencies and qualifying private businesses who have been granted an exemption.  It is the financial institution that is required to prepare and submit the CTR.  In order to complete the CTR form, however, the financial institution is required to verify and record the name and address of the person presenting a transaction, and the identity, account number, and the social security number or taxpayer identification number, if any, of any person for whom a transaction is to be affected.  This verification must be made with governmental identification such as a driver's license or passport.  These CTR rules apply to the deposit, withdrawal, exchange of currency, or other payment or transfer, by, through, or to such financial institutions, which involves a transaction in currency, bank checks, cashier's checks, money orders, and traveler's checks of more than $10,000.  As defined in 31 U.S.C. § 5312(a)(2)(R), a money service business like EL RINCONCITO is for the purposes of federal law a "financial institution" that is required to comply with these reporting requirements.

22.     It is a felony under 31 U.S.C. § 5324(a)(3) to structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.  Structuring is the act of dividing what would otherwise be a large transaction into a series of smaller transactions to avoid scrutiny by law enforcement or to evade record reporting requirements set by federal laws.  Section 5324(a)(3) requires proof that the defendant act with the intent to evade the CTR reporting requirement discussed above, but it does not require proof that the defendant act with knowledge that his conduct was unlawful.  *See United States v. Pang*, 362 F.3d 1187, 1193-94 (9th Cir. 2004).

23.     It is a felony under 31 U.S.C. § 5324(a)(1) to cause or attempt to cause a financial institution to fail to file a CTR.  This provision encompasses multiple

transactions occurring at the same financial institution, or different branches of the same financial institution, on the same business day.  In the case of multiple transactions in one day which aggregate above the $10,000 CTR threshold, the multiple transactions are treated as one under 31 C.F.R. § 103.22(c)(2), thereby triggering the bank's or other financial institution's obligation to file a CTR.  Thus, an individual who, for purposes of evading the CTR requirement, deposits $9,000 cash into an account of Bank of America in the morning and another $9,000 in cash into the same account at Bank of America in the afternoon has violated Section 5324(a)(1).

24.     Pursuant to 31 U.S.C. § 5313(a), the Secretary of the Treasury may prescribe additional recordkeeping or reporting requirements for domestic financial institutions involved in a transaction for the payment, receipt, or transfer of United States currency or other monetary instruments.  This authority is further outlined in 31 C.F.R. §§ 103.33(f) and 1010.410(e), where a nonbank financial institution that conducts a transaction of $3,000 or more for a customer on the same day must retain a record of the following information: (a) name and address of the originator or transmitter; (b) the amount of the payment or transmittal order; (c) the execution date of the payment or transmittal order; (d) any payment instructions received from the originator or transmitter with the payment or transmittal order; and (e) the identity of the beneficiary's bank or recipient's financial institution.  In addition, the originator's bank or transmitter's financial institution must retain as much of the following information as the bank or nonbank financial institution receives with the payment or transmittal order: (1) name and address of the beneficiary or recipient; (2) account number of the beneficiary or recipient; and (3) any other specific identifier of the beneficiary or recipient.

25.     I know from my experience and training that "structuring" of cash transactions is a common practice among those who commit fraud, drug traffickers, money launderers, and other criminals who seek to avoid law

enforcement scrutiny of large cash transactions.  I also have learned that illegal money service businesses (as described below) often engage in structuring cash deposits in amounts below $10,000 to avoid generating CTR's and to avoid law enforcement scrutiny.  As described below, in the course of this investigation I have uncovered numerous instances involving the structuring of cash deposits by GARCIA and his business, EL RINCONCITO.

## B.  APPLICABLE MONEY LAUNDERING STATUTES

26.      Pursuant to 18 U.S.C. § 1956(h), it is unlawful for any person to conspire to commit any offense defined in 18 U.S.C. §§ 1956 or 1957, and that person is subject to the same penalties as those prescribed for the offense that was the object of the conspiracy.  The elements of this conspiracy offense are:

1. There must have been an agreement by two or more parties to commit money laundering;

2. The defendant must have joined the agreement knowing its purpose; and

3. The defendant must have had the intent to further the illegal purpose.

27.      As most relevant to the money laundering conspiracy at issue here, it is unlawful under 18 U.S.C. § 1956(a)(2)(B) for any person to transport, transmit, or transfer, or attempt to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity, and knowing such transportation, transmission, or transfer is designed in whole or in part:  (i) to conceal or disguise the nature, the location, the source, the ownership, (or the control of the proceeds of specified unlawful

activity; or (ii) to avoid a transaction reporting requirement under state or federal law.  The elements of this criminal violation are:

1. The defendant transported money from a place in the United States to or through a place outside the United States;

2. The defendant knew that the money represented the proceeds of some form of unlawful activity; and

3. The defendant knew the transportation was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity or to avoid a transaction reporting requirement under state or federal law.

28.   Pursuant to 18 U.S.C. § 1956(a)(3), it is unlawful to engage in a financial transaction with the intent to promote the carrying on of specified unlawful activity, and to knowingly conduct and attempt to conduct a financial transaction affecting interstate or foreign commerce involving:  (a) property represented by a law enforcement officer to be proceeds of a specified unlawful activity; or (b) property used to conduct or facilitate specified unlawful activity.  This provision is commonly referred to as the "money laundering sting" provision.  The elements for the money laundering sting offense are as follows:

1. A person conducts or attempts to conduct a financial transaction;

2. The transaction involves property represented by a law enforcement officer, or another person acting at the direction of a law enforcement officer, to be the proceeds of a specified unlawful activity; and

3. The person acts with the intent to: (a) promote the carrying on of a specified unlawful activity (SUA); (b) conceal or disguise the nature,

location, source, ownership, or control of property believed to be the proceeds of a SUA; or (c) avoid a transaction reporting requirement under state or federal law.

## IV.   THE INVESTIGATION

## A.  BACKGROUND OF THE INVESTIGATION

29.     The United States Department of Justice, Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), and local law enforcement have been investigating a drug trafficking organization located within the Eastern District of California and elsewhere.  As part of this investigation, partnering agencies identified Juan Jose Valenzuela-Bustamante (Valenzuela) as a drug trafficker who uses Ramon GARCIA to move cash drug proceeds from the United States to Mexico.  Moreover, GARCIA has had ongoing communication with an undercover agent (UCA) and a confidential source (CS)[1] regarding his money laundering activities.

---

[1] The CS has previously provided information to the DEA, HSI, and IRS-CI that has been corroborated and proven to be reliable.  The CS has conducted controlled purchases of narcotics from individuals related to this investigation where the CS purchased one kilogram of suspected heroin and one pound of methamphetamine.  The CS has also introduced an undercover law enforcement officer to a target subject, which in turn led to a traffic stop and search warrant resulting in the seizure of 62 pounds of methamphetamine, 3.2 kilograms of heroin, and approximately $52,500 in drug proceeds.  The CS also provided information and conducted recorded calls which resulted in a traffic stop and seizure of one kilogram of heroin.  The CS began working with the DEA, HSI, and eventually IRS-CI after being arrested pursuant to DEA Sacramento's investigation in October 2020, after which the CS admitted to participating in drug trafficking (though he/she minimized his/her role in the organization).  The CS has been cooperating with law enforcement in exchange for possible leniency in charging and/or sentencing and was granted "Deferred Action" by DHS allowing him/her to remain in the U.S.  To my knowledge the CS has not been paid by any of partnering agencies in this investigation.  The CS's criminal history consists of being arrested in 2015 for possession/purchase of sale of narcotics, altering/removing ID mark on a firearm, and possession of a controlled substance while armed, but all three charges were dismissed in 2018.  Law enforcement also observed the CS in November 2020 meeting with known heroin traffickers on two occasions without the controlling agent's prior knowledge.  When asked about one of these meetings, the CS admitted to facilitating an introduction between traffickers who conducted a drug deal.  Regarding the other meeting, the CS stated that the meeting was a social interaction during which there was discussion of drug trafficking, though no drugs were actually sold or used.

30.     Based on these communications, as well as law enforcement reporting, agents know that: (a) GARCIA is the owner of a money remitting business known as EL RINCONCITO in Lodi, California; (b) he collects and wires drug proceeds to Mexico using nominee names and structured transactions through his EL RINCONCITO business; (c) he launders money for several large-scale drug traffickers; and (d) he charges an additional fee to move drug proceeds.

31.     For example, the CS reported that Valenzuela (the aforementioned drug trafficker) frequently delivered cash to GARCIA over the course of several months—specifically, from March 2021 to November 2021.  GARCIA would break the cash down into smaller amounts that were then transferred to different individuals in Sinaloa, Mexico.  The CS told agents that, at one point, Valenzuela introduced the CS to GARCIA over the phone to discuss whether GARCIA would accept delivery of $5,000 to $6,000 to be moved to Mexico.  During the call, GARCIA told the CS to come visit EL RINCONCITO around the time the business closes.

32.     On December 8, 2021, the Honorable Magistrate Judge Deborah Barnes issued an arrest warrant for Valenzuela for violations of 21 U.S.C. § 846, conspiracy to distribute controlled substances.  On this same date, Judge Barnes issued a search warrant for 3203 East Forest Lake Road, Acampo, CA 95220, which was the residence of Valenzuela.  This search warrant included a silver 2015 Chevrolet Tahoe bearing CA license plate 8KQE568, registered to Ismael Aispuro Valencia at 3203 East Forest Lake Road, Acampo, CA 95220.  This federal search warrant also authorized law enforcement to seize mobile phones, which could be used to participate in a conspiracy to distribute controlled substances.

33.     On December 9, 2021, the DEA along with other investigating agencies conducted an enforcement operation for the arrest of Valenzuela and search of 3203 E. Forest Lake Road, Acampo, CA.  During this operation, officers seized

approximately 311.5 g of a heroin-like substance, 65.5 g of suspected M-30 fentanyl pills, 547.7 g of suspected cocaine, four handguns (two of which were ghost guns without serial numbers), a rifle, and ten AR-15 style rifles (seven of which were ghost guns without serial numbers).  Officers took Valenzuela into custody while he was driving a Chevrolet Tahoe bearing California license plate 8KQE568.  During a cursory search of the vehicle, mobile phones were located in the front seats of the vehicle.  Law enforcement seized these cell phones pursuant to the court-authorized search warrant.  [Note: As relevant to the current proposed search warrant, it is clear from recorded conversations from later undercover operations involving GARCIA that GARCIA had knowledge of Valenzuela's drug trafficking activities and arrest.]

34.     On January 25, 2022, a subsequent search warrant was issued for the contents of these seized cellular devices, which are described as a pink and black Motorola cell phone with green case (IMEI: 356889114134097) and a pink and black Motorola cell phone with black case (MEI: 356889114309947).

35.     On March 24, 2022, Valenzuela pleaded guilty to a conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), in the Eastern District of California.

36.     Based on the court-authorized search of the contents of the seized cell phones, law enforcement learned that the Motorola cellular phone with IMEI: 356889114309947 was identified with telephone number (209) 843-8218 (Valenzuela's phone) and contained WhatsApp messages with an unidentified individual using the telephone number 52-667-492-6388.  This unidentified number was saved in the device with the name "Gasolinas."

37.     On November 30, 2021, Gasolinas sent messages through WhatsApp to Valenzuela's phone that contained the following names:  Luis Fernando Gomez Aguilar, Sabine Arisbel Santos Osuna, Guillermina Adilene Medina Garay,

Guadalupe Morales Vega, Jose Raul Medina Morales, Mireya Morales Vega, Julian Herrera Morales, Rigoberto Vega Meza, and Abigail Medina Garay.

38.     On or about December 7 and 8, 2021, Valenzuela's phone sent and received Short Message Service (SMS) text conversations with telephone number (209) 430-2095, a number that was saved in the device as "Don Ramon."  Based on mobile records obtained from T-Mobile pursuant to a DEA administrative subpoena, law enforcement learned that the telephone number of (209) 430-2095 belongs to EL RINCONCITO, Incorporated, with a mailing address of 16 N. Central Avenue, Lodi, California.  During later investigation in an undercover operation, it was determined that this phone number was utilized directly by GARCIA to send messages regarding financial transactions related to drug trafficking, which will be described in greater detail later in this affidavit.

39.     On December 7, 2021, Valenzuela's device sent SMS messages to GARCIA's telephone number (209-430-2095) that contained the following five names:  Luis Fernandez Gomez Aguilar, Sabine Arisbel Santos Osuna, Guillermina Adilene Medina Garay, Guadalupe Morales Vega, and Jose Raul Mendia Morales.  These were many of the same names that law enforcement found had been sent to Valenzuela's device by the "Gasolinas" phone number mentioned above.

40.     On December 8, 2021, GARCIA's phone sent Valenzuela's phone a series of Multimedia Messaging Service (MMS) text messages that contained images of wire remittance receipts and pictures of a computer screen with wire transfer data.  The data included the exact date/time of the transaction, the reported addresses of the sender, and the Money Transfer Control Number (MTCN) for each transaction conducted through Vigo, which is a subsidiary of Western Union.

41.     A check of Western Union records obtained by subpoena reveals the full picture of these transactions.  The following table shows a summary of the transactions:

| Date | Sender Name | Sender Location | Sender Phone | Payee Name | Payee Location | Amount USD |
|---|---|---|---|---|---|---|
| 12/8/2021 | PERLA GITZEL BELTRAN CORRALES | Lodi, CA | 2097474402 | JOSE RAUL MENDIA MORALES | Culiacan, Mexico | $2,000 |
| 12/8/2021 | FIDELIA QUINONEZ ANGULO | Lodi, CA | 2097470133 | GUILLERMINA ADILENE MEDINA GARAY | Culiacan, Mexico | $2,000 |
| 12/8/2021 | CARLOS JARED CARDENAS MARTINEZ | Lodi, CA | 2094259901 | SABINE ARISBEL SANTOS OSUNA | Culiacan, Mexico | $2,000 |
| 12/8/2021[2] | VICTOR RAMON COVARRUBIAS ZAZUETA | Galt, CA[3] | 9164202501 | GUADALUPE MORALES VEGA | Culiacan, Mexico | $2,000 |
| 12/8/2021 | VICTOR RAMON COVARRUBIAS ZAZUETA | Galt, CA | 2095707701 | LUIZ FERNANDEZ GOMEZ AGUILAR | Culiacan, Mexico | $2,000 |

*Note: Some of the images sent from GARCIA's phone to Valenzuela's phone did not reflect the dollar amounts sent in the wire remittance transactions. Some of the missing data was derived from records obtained from Western Union's subpoena production.*

42.     Law enforcement also located WhatsApp messages sent from Valenzuela's device to Gasolinas on or about December 8, 2021 that contained the same images of wire remittance receipts and a computer screen showing the transactions listed above.

43.     Based on my training and experience and the facts as set forth in this affidavit, I submit that there is probable cause to believe that GARCIA used his cell phone and his EL RINCONCITO business to conspire with Valenzuela and Gasolinas to launder monetary instruments in violation of 18 U.S.C. §§ 1956(h)

---

[2] According to the information provided in Valenzuela's phone, it is believed the transaction using payee name Luis Fernandez Gomez Aguilar was rejected by Western Union.  A subsequent transaction with the same MTCN was sent shortly afterwards using payee name Guadalupe Morales Vega.

[3] The transaction record appears to incorrectly list the city as "Golt, CA" rather than Galt, CA which is a nearby location from EL RINCONCITO.

and 1956(a)(2)(B) by sending money that GARCIA knew came from illegal drug trafficking activities from the United States to Mexico, and concealing the true identities of the payees and senders of those monetary instruments.  The coconspirators, including GARCIA, sent the wire remittance through EL RINCONCITO to promote the drug trafficking organization's objectives. Furthermore, GARCIA purposely structured the payments below $3,000 to avoid triggering the identification and recordkeeping requirements set forth by BSA laws and the Secretary of Treasury.  I believe these affirmative acts created incomplete and inaccurate records which are required to be maintained for BSA and Anti-Money Laundering (AML) administrative audits and thus impeded law enforcement investigations.  As a consequence of the actions by GARCIA, the ownership and control of the illegally derived funds in transit to Mexico were intentionally concealed, violating U.S. money laundering statutes.

44.     Your affiant further reviewed the contents of Valenzuela's phone, and I identified approximately 50 images containing EL RINCONCITO wire remittance receipts, dated between November 5, 2021 and December 8, 2021.  All of these transactions typically used different identities for the recipient and sender names, with a payment amount of $2,500 or less for each transaction.  These EL RINCONCITO wire remittance transactions totaled approximately $95,100. Furthermore, in my analysis of the contents of Valenzuela's phone, I found that it was common for the recipient and sender names to have different surnames, which could infer the individuals are not related.

45.     Based on my training and experience, and conversations with more experienced agents, I know that it is common practice for drug trafficking and money laundering organizations to use cash intensive businesses, like MSBs, to conceal the source of illicit funds with legitimate transactions.  It is also common for drug trafficking and money laundering organizations to hide the identity and ownership of illicit proceeds with the use of nominees or by using names not associated with the transaction.  Moreover, these drug trafficking and money

laundering organizations are known to conceal the movement of funds by structuring transactions below the mandatory government reporting requirements in an effort to limit their exposure to law enforcement.

46.     Based on my training and experience, I know that structuring is a crime that involves dividing large amounts of cash/currency into smaller sums that fall below reporting or recordkeeping thresholds and then depositing the funds directly into the financial system (through MSBs or banks) on one or more days, to avoid detection.  Money laundering facilitators often break transactions down—as GARCIA appears to have done here—splitting the transactions into multiple transactions to avoid red flags that a wire transfer service company would likely detect.

47.     Moreover, based on my analysis of historical wire remittance records received in response to subpoenas, I believe that GARCIA's money laundering activities using his EL RINCONCITO business began well before the above-described transactions in 2021.  Specifically, I reviewed these records to determine whether GARCIA uses the same sender and/or recipient names in his wire transactions to Mexico.  Based on my analysis of these records, I believe that GARCIA followed the same modus operandi when conducting his illicit money laundering.  For example: (a) rather than use the name of the actual sender of the funds to transfer funds to Mexico, GARCIA appears to either invent or use his customers' names from previous transactions; (b) law enforcement found that GARCIA tends to repeat the use of the same sender names over and over again; and (c) law enforcement also found a similar repeat pattern linked to the recipient names designated in the money-laundering transactions described above involving Valenzuela, the known drug trafficker.  Using those repeated, suspect sender/recipient names, I was able to search subpoenaed records and identify at least 500 transactions that appear to be linked to GARCIA's money-laundering conspiracy dating back to at least April 2018.

Affidavit of Special Agent Brandon Yenter, IRS-CI

48.     Based on this information, and for the additional reasons explained below, law enforcement is presently requesting a search warrant of, among other things, GARCIA's cell phone and his EL RINCONCITO business.  I submit that there is probable cause to believe that GARCIA has used this cell phone and business to further his illegal money laundering activities dating back to at least as early as on or about April 2018, and thus there is probable cause to believe that law enforcement will find additional evidence of those illegal activities as a result of a search of that cell phone and location.

49.     That probable cause is only further buttressed by law enforcement's investigation of GARCIA's more recent activities.  Specifically, after learning the information described above in connection with its investigation concerning the drug-trafficking activities of Valenzuela, law enforcement began to focus part of its investigation on the activities of GARCIA and his business, EL RINCONCITO.  The information learned during this follow-on investigation are described in more detail below.

## B. ADDITIONAL INVESTIGATION INTO THE ILLICIT ACTIVITIES OF GARCIA AND EL RINCONCITO

50.     According to records from DHS, GARCIA entered the United States on September 22, 1971, from Mexico.  According to the historic DHS record, GARCIA is a United States citizen, who was naturalized on January 27, 1999.

51.     GARCIA owns and operates EL RINCONCITO, a business that is incorporated with the Secretary of State for the State of California.  EL RINCONCITO is a Money Service Business ("MSB") that offers its clients check cashing and wire remittance services.  EL RINCONCITO has in the past been an agent location for several wire remittance companies and their subsidiaries,

including Western Union, Ria Money Exchange, and MoneyGram.[4]  Based on my training and experience, I know that these wire remittance companies use their network of agents to transfer funds.

52.     EL RINCONCITO is located in a small, detached building on a street corner at 301 E. Pine Street in Lodi, California.  Based on the building's appearance, the structure may have previously been used as a walk-up restaurant location with sliding windows and an exterior counter.  Customers who visit the location typically conduct business through the sliding windows.  Law enforcement has determined that GARCIA works at the location based on observations during surveillance and in undercover operations.  In addition to GARCIA, GARCIA's wife, Maricela Mesino Gonzalez (Gonzalez), works at EL RINCONCITO,[15]  along with other employees.

53.     An open internet search on the City of Lodi's website shows that EL RINCONCITO holds a Business License with Business License Account Number 09703988 from January 25, 2012, through December 31, 2022.  EL RINCONCITO's address is listed as 301 E. Pine Street in Lodi, California.

54.     According to subpoenaed records from the Bank of Stockton, GARCIA is the president and his wife, Gonzalez, is the Secretary of EL RINCONCITO, which is listed as operating at 301 E. Pine Street in Lodi, California.

55.     According to records maintained by Ria Financial, which is the parent company for Ria Money Exchange (of which EL RINCONCITO was a registered agent), GARCIA is the President of EL RINCONCITO.  According to the client

---

[4] According to a Western Union representative, EL RINCONCITO's business relationship was terminated on November 30, 2022, and EL RINCONCITO no longer offers Western Union's products and wire remittance services.

[5] A subpoenaed Western Union document titled "Know Your Agent (KYA) Owner's and Controlling Persons' Consent Form," dated, January 5, 2018, listed Gonzalez as a 50% owner of EL RINCONCITO.

files as part of the application to become a registered agent for Ria Money Exchange, GARCIA filed for the fictious business name of EL RINCONCITO with the County of San Joaquin Recorder's County Clerk in 2017.  Additionally, according to Ria Financial records, EL RINCONCITO was granted in 2017 a Business Tax Certificate with Business Account Number 19366 from the City of Lodi's Finance Department.  Both the document from San Joaquin County and the City of Lodi listed the business address as 301 E. Pine Street in Lodi, California.

56.     I know from speaking with other experienced law enforcement officers and with personnel at wire remitter businesses such as Western Union that these wire remitter businesses generally require their agents to complete anti-money laundering ("AML") training when they initially become agents and then once annually while they serve as agents.  The topics covered in the training provided to the agents will typically include:  the requirements of the Bank Secrecy Act, recordkeeping, structuring, willful blindness, how to detect suspicious activity, the definition of money laundering, and other red flags.

57.     According to subpoenaed records obtained from several wire remitter companies, on May 21, 2019, GARCIA signed the Agent Acknowledgement & Compliance Form as the AML Compliance Officer for AFEX,[6] a subsidiary of Ria Financial.  AML Compliance Officers are entrusted to enforce applicable AML and BSA federal laws at the underlying company and ensure employees routinely complete AML and BSA training.  Some of the training includes specific examples of the concepts discussed and requires participants to pass a quiz after completing each section.  The training is offered to participants in either English or Spanish.  The AML Compliance Officers and the employees are required to pass all training before they can provide related services on behalf of MSBs.

---

[6]  Law enforcement understands that Ria Financial and its subsidiaries terminated their business relationship with EL RINCONCITO in January 2022.

58.     I know based on my training and experience that it is routine for MSBs to have internal and external audits at the individual agent locations to address BSA policies, procedures, or operations for BSA compliance.  For example, in response to an audit, an AFEX letter dated, May 21, 2019, addressed to GARCIA summarized EL RINCONCITO's BSA compliance violations:

1.  "The Agent's Employees do not have their individual Login ID to access CES System."

2.  "The Agent does not have a monitoring process in place to prevent, detect, and report suspicious activity.  (This is a Repeat Finding)."

3.  "Recordkeeping information is not attached to orders of $3,000 or more ($1,000 or more for AZ, NM, OK)."

59.     Moreover, it appears that in response to a previous audit, AFEX sent another letter dated March 19, 2018, addressed to GARCIA, which summarized other EL RINCONCITO BSA compliance violations:

1.  "Agent must adopt and implement the Record Retention Program established in CES' Compliance Manual until a 5 Year Record Retention section is added to its Compliance Manual."

2.  "The Agent must provide ongoing Compliance Training to existing Employees."

3.  "Ongoing Compliance Training should be provided to existing Employees at least once a year."

Affidavit of Special Agent Brandon Yenter, IRS-CI

4.  "The Compliance Training that the Employees receive must include Consumer Financial Protection information."

5.  "The Agent must implement a monitoring process to adequately prevent, detect, and report suspicious activity."

6.  "The Agent must implement the necessary controls to aggregate all Cash-In transaction activity over $10,000 that is conducted by the same person on the same day and file the corresponding Currency Transaction Repot (CTR)."

54. As a result of these previous letters, and based on my general knowledge of wire remitter businesses like EL RINCONCITO,  it is my belief that GARCIA is aware of his AML and BSA obligations.  In fact, he has been warned by wire remitter companies concerning problems with his past compliance, and those wire remitter companies offered him concrete guidance about things he should do going forward in order to remain in compliance with federal law. Nevertheless, as described above and as described in the paragraphs below, GARCIA knowingly used inaccurate sender information, structured transactions, and failed to abide by BSA reporting requirements.  All of this information helps establish probable cause that GARCIA has been violating, and may still be violating, various federal money laundering statutes.

## C.  UNDERCOVER OPERATIONS – MONEY LAUNDERING STINGS

60.     IRS-CI, DEA, HSI, and local law enforcement officers conducted a series of undercover operations to determine if GARCIA is complicit in money laundering activity, and whether he is knowingly violating the BSA reporting requirements.  Between May 16, 2022, through October 7, 2022, the partnering agencies conducted a total of seven undercover operations at EL RINCONCITO

in Lodi, California or with GARCIA directly at an off-site location located within the Eastern District of California.  A CS[7] was utilized for certain of these operations, and an Undercover Agent (UCA)[8] was also used during certain operations.

61.     I submit that the evidence presented in this affidavit from the money laundering sting operations will demonstrate probable cause that GARCIA knowingly remitted money reported to be derived from a specified unlawful activity (SUA)—namely drug-trafficking—to Mexico.  These transactions were intentionally broken up into smaller increments, and names were created by GARCIA for the "sender" of the cash to disguise the fact that the CS and/or UCA was the person sending money in violation of record reporting requirements set forth by BSA laws and the Secretary of the Treasury.  Moreover, based on the conversations later presented in this affidavit, it is clear to me that GARCIA was aware that he agreed to send money for an additional fee to Mexico on behalf of an individual who was involved in the trafficking of drugs.

### 1. The UCA Inquires About a Wire Transfer at EL RINCONCITO on May 16, 2022

62.     On May 16, 2022, an undercover operation was conducted at the EL RINCONCITO business located at 301 E. Pine Street in Lodi, California.  During the operation, the UCA contacted an unidentified female[9] at the business's outdoor service counter.  The unidentified female advised that a maximum wire

---

[7] The same CS as described in the affidavit above was used for these IRS-CI undercover operations.

[8] The UCA has been employed with the Yuba County Sheriff's Department (YCSD) as a Deputy since 2014.  In 2019, the UCA was assigned to NET-5 and eventually assigned to this OCDETF investigation.  In 2020, the UCA began to serve as a UCA, and he attended several non-official UCA courses.  In April 2022, the UCA completed formal UCA training that was conducted in Los Angeles, California.

[9] Based on law enforcement observations and surveillance, GARCIA was present at the business during this initial contact at EL RINCONCITO.

remittance of $980.00 can be sent without an identification.  The UCA terminated the conversation and departed the business.

63.      Shortly afterwards, the UCA returned to EL RINCONCITO and contacted the unidentified female a second time.  He verbally provided his undercover identification information in an effort to send the $980.00 wire remittance.  The unidentified female asked UCA to return with an identification, and the operation was terminated.

64.      Based on this interaction, I believe that the employees at EL RINCONCITO have received at least some training in the legal requirements for sending wire transfers (including requirements concerning the provision of IDs in support of such transfers)—training that (as described above) is required by wire remitter companies like Western Union and Ria Financial before businesses can operate as "agents" for these wire remitter companies.

### 2.  The CS Contacts GARCIA

65.      On or about May 24, 2022, at the direction of law enforcement, the CS called GARCIA on GARCIA's phone to arrange for the delivery of $4,000 in cash to be wired to Mexico through EL RINCONCITO on a future date.  This call and other communications between the CS and GARCIA were recorded.

66.      The actual purpose of the phone call—unbeknownst to GARCIA—was to attempt to coordinate a sting money laundering operation.  As far as GARCIA was aware, the purpose of the phone call was to coordinate the transfer of money from the CS to GARCIA so that GARCIA could then wire money to other individuals on the CS's behalf.  GARCIA later agreed to meet the CS on June 10, 2022.

### 3.  GARCIA - Pre/Post Undercover Operation Coordination

67.     Prior to and after the operation that occurred on or about May 24, 2022 involving the CS and GARCIA, and prior to and after the subsequent CS and/or UCA operations described later in this affidavit, law enforcement would typically follow a repeating pattern of activities in order to coordinate and maintain control over the operations.

68.     For example, the CS and/or UCA would typically contact GARCIA via GARCIA's telephone ((209) 430-2095) several days before the planned operation.  They would coordinate a time and meeting location.  The morning of the operation, the CS and/or UCA would call GARCIA's telephone to confirm his ability to meet and provide an approximate time of arrival at the meeting location.

69.     An IRS-CI Security Cover Agent (SCA) would procure recoverable and nonrecoverable funds for each undercover operation.  These funds were presented to the UCA on the morning of the operation, and the money would be counted.  In the operations where the CS was introducing the money, the UCA provided the recoverable and nonrecoverable funds to the CS at the staging location for the operation.  Otherwise, the UCA retained the money until it was provided to GARCIA.

70.     Prior to the operation, the CS and/or UCA would create recipient names or reuse recipient names from a previous operation.  The CS and/or UCA would create one recipient name for every $2,000 increment of funds that were to be transferred by GARCIA.  These names were written on a piece of paper, and photos were taken of the pieces of paper for later use as evidence.  The CS and/or UCA was instructed to only provide GARCIA with the piece of paper with the recipient names and a location (Culiacan, Sinaloa, Mexico) for the payment to be sent in order to conduct the transaction.

71.     The CS and/or UCA agreed to be consensually monitored before each operation, and a FLETC-trained IRS-CI agent provided covert electronic recording device(s) and/or placed these device(s) on the CS's and/or UCA's person.  These same covert electronic recording device(s) were retrieved from the CS and/or UCA at the conclusion of each operation.  The communications in these recordings were primarily conducted in Spanish.  The recordings from these in-person meetings were later translated from Spanish-to-English by qualified interpreters and transcribed[10] using IRS-CI procured transcription services.  These transcriptions are used in this affidavit when I am describing the conversations that took place with GARCIA during the operations.

72.     Both before and after every meeting the CS attended with GARCIA, the CS and CS's vehicle were searched for contraband and weapons, with negative results.  The UCA subsequently drove the CS's vehicle to and from the agreed upon meeting location while being escorted by agents.  The UCA remained in the vehicle for every meeting with GARCIA until the UCA was introduced on July 22, 2022.  The latter undercover operations were conducted without the CS.

### 4.  GARCIA Participates in Money Laundering Activities on June 10, 2022

73.     On June 10, 2022, the CS contacted GARCIA on GARCIA's phone (NOTE:  This is the same phone described in Attachment A-3 that law enforcement is requesting permission to search as part of this search warrant affidavit.)  GARCIA instructed the CS to meet at a Chevron gas station located on Highway 99 in Stockton, CA, which is a location in the Eastern District of California.  GARCIA arrived at the Chevron in a white GMC Sierra that law enforcement determined based on DMV records to be registered to "GARCIA RAMON ROBELDO, OR MESINOGONZALEZ MARICELA."  (NOTE:  This GMC

---

[10] There was no transcription created for the undercover operation on May 16, 2022.

Sierra is the vehicle described in Attachment A-4 that law enforcement is requesting permission to search as part of this search warrant affidavit.)

74.     During the meeting, the CS told GARCIA that he was referred to GARCIA by "Sandaloma [phonetic spelling], he's a little fat guy."  (From their investigation of Valenzuela, law enforcement had discovered Valenzuela commonly used the pseudonym "Sandaloma.")  GARCIA replied, "Oh, Juan."  "I haven't seen him, he got caught, mmm…"  Later in the conversation, GARCIA explained his knowledge of Valenzuela's arrest:

> Yes, they caught him. It's been since…oh, well, it's been since November.
>
> Yes, he got caught, uh…yeah- I don't know if it was you, but he had told me about you, in fact- but…they arrested him along with three (3) or four (4) other guys.
>
> Yes, and you see- look, he lost a lot of, a lot of money and so I said to him, "Take it easy. You have too much, get somebody else…and so then-, well the bad thing was that he bought guns. So, he got caught because of the guns.
>
> Yes, yes-yes…he was very-… The thing is that he went and got into- he bought some guns that he shouldn't have bought like the AK-47s [cuernos de chivo], and so that's where they got him, they tracked him down and then they- well, I don't know what he was charged with because of the guns, but not for the drugs, and then they also caught three (3) other ones, the other three (3) guys who sold him the guns. Yeah? And so then- hmm…well, his wife-…

He didn't listen to me! I worked- I mean, I have known these people for thirty (30) years, I know them all- a lot of them from Culiacan. I know a lot of them from Modesto, uh…from-from-the-the-Ceres.

75.    GARCIA further explained that: "Yes, way over there and…I moved a lot of money for them.  Well, I- got up to a million ($1M) dollars."  "He only has his distributors come here and now there is another gentleman that they call 'Prieto.'" GARCIA explained that the product that "Prieto" provides was "Pure coke," and "It is good."  GARCIA asked the CS if he was interested in distributing the narcotics, and—if so—he would put him in contact with Prieto.

76.    The CS provided GARCIA with $6,000 in cash, comprised of mixed denominations, including $10s, $20s, and $100-dollar bills.  He also handed GARCIA a piece of paper containing three payee names and provided verbal instructions to send the money to Culiacan, Mexico.  Since there were no payor or sender names provided by the CS, GARCIA stated, "I will get the identifications [IDs]."  "And…okay, I will charge you a hundred (100) for each transfer."  GARCIA later explained that "I will send you the picture," and "On the bottom of the picture, it'll show who the sender is."

77.    Based on the information gathered from this investigation, I know that the "hundred (100) for each transfer" GARCIA was referring to in this conversation is a money laundering fee, which included the fees associated with the Western Union transfer (approximately $20 per each $2,000 sent), and an identification [ID] (payor/sender name) used to send the money.  Moreover, GARCIA in this conversation was telling the CS that he would text an image of the receipt to confirm that the wire remittance was successfully sent.  As described in more detail below, these receipts contain transactional data (i.e., a money transfer control number ("MTCN"), sender and recipient information, etc.) which is needed to be provided at the time of receiving funds.

78.     When GARCIA departed the Chevron, the surveillance team followed him in the GMC Sierra to his residence located at 4600 Tudor Rose Glen, Stockton, California.  (NOTE:  This is the residence that is described in more detail in Attachment A-1 that law enforcement seeks permission to search as part of this search warrant affidavit.)  GARCIA entered the residence and later returned with a long, dark object, which was placed in the bed of the GMC Sierra.  GARCIA made several trips to the residence, and the GMC Sierra was repositioned at a different driveway at the residence.  Eventually, the GMC Sierra departed the residence and arrived at EL RINCONCITO at 301 E. Pine Street in Lodi, California.  GARCIA opened the back door to the business and placed what appeared to be the same long, dark object (which appeared to be a black bag) inside the door.

79.     The next day, on June 11, 2022, at approximately 9:07 AM, MMS messages containing images of wire remittance receipts were sent from GARCIA's phone number to the CS's cellular phone.  The images contained the following transactional data:

| Date | MTCN | Senders Name | Payee Name | Payee Location |
|------|------|--------------|------------|----------------|
| 6/10/2022 | 972-509-7285 | Unavailable | Unavailable | Unavailable |
| 6/10/2022 | 972-777-0562 | Ofelia Quiroz Galindo | Carlos Cano Rodriguez | Culiacan, Sinaloa, Mexico |
| 6/10/2022 | 972-307-9088 | Leticia Yaratzed Zazueta Verdugo | Luis Gonzalez Castillo | Culiacan, Sinaloa, Mexico |

**Note: The images for the transactions listed above did not include the U.S. dollar amounts remitted.**

80.     Minutes later, at approximately 9:37 AM, a follow-up MMS message was sent from GARCIA's phone to the CS's phone containing an image of a computer screen with transactional data which clarified the payor/senders for transaction MTCN 972-509-7285:

| Date | MTCN | Senders Name | Payee Name | Payee Location |
|------|------|--------------|------------|----------------|

| 6/10/2022 | 972-509-7285 | Moises Alejandro Yanez Osuna | Fabian Morales Padilla | Culiacan, Sinaloa, Mexico |
|---|---|---|---|---|

81.     A check of wire transactions by cross-referencing the above listed MTCN transaction numbers from transactional data provided by a Western Union representative revealed that each of the three payments were made for $1,900 instead of $2,000, which accounts for GARCIA's stated laundering fee of $100 per transaction.  The Western Union processing fee of $19 was also deducted from the transactions, which is the normal fee for an international wire transfer.

82.     To be clear, the CS had not provided GARCIA any of the "senders" names used by GARCIA for these transactions.  Instead, the CS had only provided GARCIA with the names of the recipients of the CS's funds, and GARCIA created the corresponding "senders" names in order to complete the transactions.  Law enforcement has no information about who these "senders" names are, whether they are real identities, or whether GARCIA invented these identities in order to complete the transactions.  In any event, none of these listed "senders" was the true sender of the transaction—the DEA CS—which further indicates that GARCIA was purposefully engaging in money laundering activities when he completed these wire transfers to Mexico.

### 5.  GARCIA Participates in Additional Money Laundering Activities on July 1, 2022

83.     On July 1, 2022, the investigative team conducted another undercover operation with the same CS at the same Chevron gas station described above, which is located near GARCIA's residence in the Eastern District of California.

84.     During their meeting at the Chevron gas station, the following was discussed between the CS and GARCIA about wiring money:

        GARCIA: How much is it?

CS: Six (6), the same-same thing.

GARCIA: Six (6)?

CS: Yes.

GARCIA: Yes, yes.

CS: Same as the last.

GARCIA: Okay, look…is it all right on Monday to have it for you?

85.     Based on my knowledge of this investigation, I know that when the CS said "Six, the same-same thing," he was telling GARCIA that he planned to send $6,000 to Mexico as with the previous transaction in June 2022.  Moreover, I know that GARCIA was agreeing to complete this transaction, but he wanted to have until Monday to do so.

86.     During this meeting, the CS provided GARCIA with $6,000 in cash, comprised of mixed denominations including, $20s and $100-dollar bills.  He also handed GARCIA a piece of paper containing three recipient names with instructions to send the money to Culiacan, Mexico.  Moreover, during the conversation, the CS explained to GARCIA that he sold controlled substances. Specifically, the CS told GARCIA: "…well, you- I move- this is for the brown [*morena*] one."   And "Well, I move, I move the black [*negra*] one."

87.     Based on my discussions with other experienced law enforcement officers, I know that individuals involved with drug trafficking are known to use coded language.  The "black one" and the "brown one" are commonly used terms for heroin amongst drug traffickers.

88.     In addition, during this conversation, the CS offered to introduce a drug dealer (who was in reality a UCA) to GARCIA, explaining that the UCA could be a customer interested in laundering money.  The details of this portion of the conversation are provided below:

Affidavit of Special Agent Brandon Yenter, IRS-CI

CS: You know what, I have another- well, no, I have a buddy that moves around up here in Yuba City.

GARCIA: Mmm-hmm…

CS: He moves…he moves crystal, he moves brown //and…

GARCIA: Mmm-hmm…

CS: …all that.

GARCIA: Mmm…

CS: And so, //he is also-…

GARCIA: I have, I have a young guy that brings that stuff over-…

CS: Yes?

GARCIA: …a lot of it, whatever you want. (UNINTELLIGIBLE)…

CS: Oh, really? No-no…what he has, is, uh-uh…money, you see, and sometimes he wants to move money…can, can you do that?

GARCIA: Oh, to move the money?

CS: Yes.

GARCIA: All right.

(CAMERA VISUAL PICKS UP GARCIA / SLIGHTLY NODDING HEAD AFFIRMATIVE)

89.    Later in this same conversation about GARCIA's capacity to move money, GARCIA stated that "I've taken- I, uh, I used to take up to four (4) or five (5)," and he further explained "I don't-…it's to my benefit to go over there from a hundred (100) to a thousand (1000) …to go over there."  I will note, however, that there is some discrepancy among the transcriptions that have been made of this portion of the conversation.  One transcription translated these comments made by GARCIA as "I have taken up to four or five… $500,000" and "It is more convenient for me to go there from 100 onwards."

90.    Based on my review of the transcriptions created for this operation, I believe that the second transcription described above for this portion of the

conversation is more accurate.  This transcription stated that GARCIA said, "I have taken up to four or five… $500,000" and "It is more convenient for me to go there from 100 onwards."  I believe this transcription is more accurate because GARCIA preferred to take larger amounts of cash because his fees are approximately $100 per transaction, and it was common practice that the money was broken into $2,000 increments.  As a result, a larger total amount for money laundering would result in more transactions—and thus more fees for GARCIA. Moreover, as described later in this affidavit, GARCIA explains how he structures these larger transactions over the course of several days to negate reporting requirements and conceal the laundering activity.

91.     According to the CS, GARCIA appeared to be in a hurry during this conversation and requested that the introduction to the UCA be conducted at a later date.  When GARCIA departed the Chevron following this meeting, the surveillance team followed but lost visual contact of the white in color GMC Sierra.  Shortly afterward, a white in color GMC Sierra was observed at EL RINCONCITO in the parking lot for the business, and an individual matching the description of GARCIA entered EL RINCONCITO.

92.     Later, on July 1, 2022, MMS messages containing images of wire remittance receipts were sent from GARCIA's phone to the CS's cellular phone. The images contained the following transactional data:

| Date | MTCN | Senders Name | Payees Name | Payee Location |
|---|---|---|---|---|
| 7/1/2022 | 972-151-7531 | Samhara Anett Meza Garcia | Fabian Morales Padilla | Culiacan, Sinaloa, Mexico |
| 7/1/2022 | 972-113-8068 | Jesus Ceja Valdovinos | Carlos Cano Rodriguez | Culiacan, Sinaloa, Mexico |
| 7/1/2022 | 972-114-4292 | Jesus Miguel Aispuro Figueroa | Luis Gonzalez Castillo | Culiacan, Sinaloa, Mexico |

93.     A check of wire transactions by cross-referencing the above listed MTCN transaction numbers from transactional data provided by a Western Union representative revealed that each of the three payments were made for $1,700,

$2,000, and $2,000, respectively. The remaining dollar amount of $300 creates an average laundering fee of $100 per transaction—which is, again, the price that GARCIA quoted to the CS as the cost of each money laundering transaction.[11]

94.     Based on my training and experience, and based on the facts described above, I believe GARCIA knowingly structured these payments below $3,000 to avoid triggering the identification and recordkeeping requirements established by the BSA. Furthermore, GARCIA intentionally charged an additional fee to launder money using unknown sender names needed to conceal the ownership of the wire remittance transactions. As a consequence of these actions by GARCIA, the ownership and control of the purported illegally derived funds that were transferred to recipients in Mexico were intentionally concealed, and records were not properly maintained—all of which violates the federal money laundering statutes.

### 6. GARCIA Participates in Additional Money Laundering Activities on July 22, 2022

95.     On July 22, 2022, the investigative team conducted another undercover operation at the same Chevron gas station used during the previous operations, which is located near GARCIA's residence in the Eastern District of California. This time, however, the operation involved not just the CS, but also the UCA, who was introduced to GARCIA during the meeting.

96.     During this in-person meeting, GARCIA confirmed to the UCA and CS his ownership and the location of EL RINCONCITO:

---

[11] According to a Western Union representative, Western Union charged processing fees of $17.00, $20.00, and $20,00, respectively, for these transactions. The sum of the Western Union fees of $57.00 and the laundering fees of $243.00 totaled $300.00, which provides a $100 per transaction average.

GARCIA: Well, if you want to know where my business is?

UCA: Where is it?

GARCIA: It's on-on Pine and Washington in Lodi.

97.     In fact, EL RINCONCITO is located on the corner of E. Pine Street and Washington Boulevard in Lodi, California.  Moreover, during the undercover operation, GARCIA pointed at the residence located at the 4600 Tudor Rose Glen address, which is visible from the Chevron gas station where the meeting took place.  He told the UCA and CS: "I live there in that house, you see.  Not in this one," "Right here on this street.  On this street here-…"

98.     During this meeting, the UCA provided GARCIA with $8,000 in cash, comprised of mixed denominations, including $10s, $20s, and $100-dollar bills. He also handed GARCIA a piece of paper containing four recipients names with verbal instructions to send the money to Culiacan, Mexico.  Later, at the instruction of GARCIA, the CS provided the UCA GARCIA's phone number.  The UCA texted GARCIA to provide GARCIA with his/her contact information.

99.     The CS and/or UCA did not explicitly mention during this operation that the money that the UCA wanted to transfer was derived from drug trafficking. However, as described above, during a previous undercover operation, the CS stated to GARCIA that the UCA "moves crystal" and "moves brown," which I know based on discussion with other law enforcement officers are common codewords for controlled substances.  Moreover, when the CS initially greeted GARCIA at the July 22, 2022 meeting, the CS introduced the UCA to GARCIA, stating "What's up?  Do you remember- uh, //the guy I told you about?" In response, GARCIA replied, "//Yeah…"

100.    Based on the statements the CS previously made to GARCIA as well as GARCIA's acknowledgment of these previous statements, I believe that GARCIA knew that the proceeds he was being asked to transfer to Mexico were derived

from the sale of illegal substances.  This knowledge is further supported by the fact that GARCIA instructed the CS and UCA to meet him not at his business (EL RINCONCITO) but at an offsite location away from EL RINCONCITO.  I believe this is consistent with the patterns GARCIA used when laundering money he knows to be derived from illegal drug-trafficking activities, as described elsewhere in this affidavit.  To further support my belief, I find it notable that GARCIA did not ask the CS or UCA to see a government issued identification before agreeing to transfer the specified funds—which is a requirement imposed by the Secretary of Treasury and BSA for transactions greater than $3,000.  This knowing violation of the federal reporting requirements helps illustrate GARCIA's intentions to conceal the source of the funds.

101.    Following this transaction, the surveillance team followed GARCIA from the Chevron to his residence located at 4600 Tudor Rose Glen Road in Stockton, California.  GARCIA parked the white in color GMC Sierra in the driveway and exited the vehicle.  Surveillance of GARCIA's vehicle/residence was terminated approximately one hour later.

102.    On July 23, 2022—*i.e.*, the day after the in-person meeting at the Chevron—four MMS messages containing images of wire remittance receipts were sent from GARCIA's phone to the UCA's cellular phone.  The images contained the following transactional data:

| Date | MTCN | Senders Name | Payees Name | Foreign Payout |
|------|------|--------------|-------------|----------------|
| 7/22/2022 | 972-692-8527 | Karla Dayana Camcho Del Gado | Julio Vegas Romero | Culiacan, Sinaloa, Mexico |
| 7/22/2022 | 972-184-7752 | Michelle Cebreros Bustamante | Maria Cruz Hinojosa | Culiacan, Sinaloa, Mexico |
| 7/22/2022 | 972-948-4592 | Jesus Roberto Gonzalez Astorga | Antonio Garcia Castaneda | Culiacan, Sinaloa, Mexico |
| 7/23/2022 | 972-476-0530 | Gerardo Jr Lopez | Martha Dominguez Soto | Culiacan, Sinaloa, Mexico |

103.    A check of wire transactions by cross-referencing the above listed MTCN transaction numbers from transactional data provided by a Western Union

representative revealed that each of the four payments were made for $2,000, $2,000, $2,000, and $1,610, respectively.  According to a Western Union representative, Western Union charged a processing fee of $20.00, $20,00, $20.00, and $16.10, respectively, for these transactions.  The sum of the Western Union fees of $76.10 and GARCIA's additional laundering fees of $313.90 totaled $390.00, which averages out to $97.50 per transaction.

104.    Again, based on my training and experience and knowledge of this investigation, I believe GARCIA knowingly structured these payments below $3,000 to avoid triggering the identification and recordkeeping requirements established by federal law.  Furthermore, GARCIA intentionally charged an additional fee to launder money using unknown sender names needed to conceal the ownership of the wire remittance transactions.  As a consequence of these actions by GARCIA, the ownership and control of the illegally derived funds in transit to Mexico were intentionally concealed, and records were not properly maintained, which—once again—violated U.S. money laundering statutes.

### 7.  GARCIA Participates in Additional Money Laundering Activities on August 19, 2022

105.    On August 19, 2022, the investigative team conducted an additional undercover operation with the UCA at the same Chevron gas station used in the previous operations, which is located near GARCIA's residence in the Eastern District of California.

106.    During the meeting, the UCA provided GARCIA with $12,000 in cash, comprised of mixed denominations, including $20s and $100-dollar bills in a yellow plastic bag.  The UCA also handed GARCIA a piece of paper containing six payee names with instructions to send the money to Culiacan, Mexico.

107.    During the operation, GARCIA reiterated his laundering fee in the conversation with the UCA:

> UCA: How much do you charge?
> GARCIA: One hundred (100), a hundred (100) at least, eh-…
> UCA:  And, so…if I wanted to send more-…do- do you charge the same amount?
> GARCIA: All the same.

108.    GARCIA further explained during the meeting how he would structure the payments: "…I can do-…well, starting with-… I can do three (3) daily."  The UCA further questioned if he would be able to send $30,000 or $50,000.  GARCIA told the UCA: "Yes, it can be done," and "I'll take my time."

109.    Based on my training and experience, and the totality of the evidence gathered in this investigation, I believe GARCIA typically structures his money laundering transactions at $2,000 or less to avoid the CTR filing requirements. This is also done to conceal a pattern of suspicious activity from regulator auditors, wire remittance compliance officers, and law enforcement.  Moreover, GARCIA was explaining to the UCA that if the UCA wanted to send larger amounts of money to Mexico, GARCIA could help with this activity, but that it would take additional time because he would be breaking the total amount up into smaller amounts and sending the cash as part of multiple transactions over the course of multiple days.  Again, this kind of activity would be intended to avoid the usual CTR filing requirements in an attempt to avoid law enforcement (or private wire remitter) scrutiny of the transactions.

110.    Following this discussion, GARCIA placed the yellow plastic bag (containing $12,000 in cash) in the driver seat of the same white in color GMC Sierra.  GARCIA departed the Chevron and drove to his residence at 4600 Tudor Rose Glen Road.  GARCIA exited the vehicle and walked into the residence's

front door.  The surveillance team conducted approximately 40 minutes of surveillance before terminating the surveillance.

111.   The next day, on August 20, 2022, MMS messages containing images of wire remittance receipts were sent from GARCIA's phone to the UCA's cellular phone.  The images contained the following transactional data:

| Date | MTCN | Senders Name | Payees Name | Foreign Payout |
|------|------|-------------|-------------|----------------|
| 8/19/2022 | 972-248-3077 | Johnny Mario Trigerous | Julio Vargas Romero | Culiacan, Sinaloa, Mexico |
| 8/19/2022 | 972-976-4451 | Sandra Diosdado Guerra | Antonio Garcia Castaneda | Culiacan, Sinaloa, Mexico |
| 8/19/2022 | 972-249-6790 | Varelia Jaqueline Valdez Niebla | Maria Cruz Hinojosa | Culiacan, Sinaloa, Mexico |
| 8/20/2022 | 972-821-0060 | Martha Alicia Naranjo Perez | Eladio Claudio Mercado | Culiacan, Sinaloa, Mexico |
| 8/20/2022 | 972-747-8234 | Luz Elena Carrillo Nunez | Martha Dominquez Soto | Culiacan, Sinaloa, Mexico |
| 8/20/2022 | 972-564-8678 | Luz Elena Carrillo Nunez | Fabian Flores Guzman | Culiacan, Sinaloa, Mexico |

112.   A check of wire transactions by cross-referencing the above listed MTCN transaction numbers from transactional data provided by a Western Union representative revealed that a combined total of $11,400 was sent through EL RINCONCITO services on August 19 and 20, 2022.  As discussed by GARCIA, these transactions were structured into three payments or less per day in the amount of $2,000 or less in violation of the CTR reporting requirements. Moreover, these payments were all sent with "sender" names that were not the name of the UCA and that the UCA had not provided to GARCIA.  Instead, it appears that GARCIA created these "sender" names on his own in order to complete the transactions and avoid showing where the transactions in fact originated.

113.   Again, based on the amounts actually sent, the laundering fee for these transactions averaged $100 per transaction, which was GARCIA's quoted fee.[11]

---

[11]   According to a Western Union representative, the Western Union processing fee for these transactions was $20.00, $20.00, $20.00, $14.00, $20.00, and $20.00 respectively.  The sum of the Western Union fees of $114.00 and GARCIA's additional laundering fees of $486.00 totaled $600.00, which provides $100 per transaction average.

In short, the structuring of the payments and associated laundering fees matched GARCIA's statements during the in-person meeting with the UCA on August 19, 2022.

114.    Once again, based on my training and experience and knowledge of this investigation, I believe GARCIA knowingly structured these payments below the $10,000 CTR reporting requirement.  Furthermore, GARCIA intentionally charged an additional fee to launder money using invented names or customers' names from prior transactions as the sender names to conceal the ownership of the wire remittance transactions.  As a consequence of the actions by GARCIA, the ownership and control of the purported illegally derived funds in transit to Mexico were intentionally concealed, and the transaction was not properly reported using a CTR, which violated the federal money laundering statutes.

### 8.  GARCIA Introduces the UCA to a Drug Trafficker and Participates in Additional Money Laundering Activities on September 16, 2022

115.    On August 20, 2022, the UCA sent a text message to GARCIA asking if he had any contacts in Stockton that he was willing to introduce him to.  Based on their past meetings, and GARCIA's past discussions with the CS, the UCA was referring in this text message to a potential introduction to a source for controlled substances.  GARCIA said he did and asked when the UCA would be available to meet with him.  The UCA told GARCIA that he would let him know.

116.    On September 8, 2022, GARCIA sent the UCA a text message and said "El Senor" was in town from Mexico.  GARCIA asked if the UCA wanted to meet

him, and GARCIA told the UCA that El Senor was going to be in town for eight to ten days.

117.    On September 12, 2022, the UCA and GARCIA arranged to meet on September 16, 2022.  The UCA and GARCIA also agreed that the UCA would deliver GARCIA $18,000 during that meeting.  GARCIA also said that he would bring El Senor with him to the meeting.

118.    As a result, on September 16, 2022, the investigative team conducted an undercover operation with GARCIA and the UCA at the Chevron gas station located near GARCIA's residence located in the Eastern District of California.

119.    GARCIA arrived in the same white in color GMC Sierra.  GARCIA walked the UCA over to a white in color Honda Pilot parked just south of the UCA's vehicle.  The driver and sole occupant of the Honda Pilot was standing near the Honda.  GARCIA introduced the UCA to a Hispanic male adult that he referred to as "El Senor."  Garcia went on to say that he has known El Senor for several years.

120.    During the meeting, the UCA provided GARCIA with $18,000 in cash, comprised of mixed denominations, including $20 and $100 bills in a brown paper bag.  He also handed GARCIA a piece of paper containing nine recipients names with instructions to send the money to Culiacan, Mexico.  GARCIA told the UCA he had to leave and would send the receipts via text message in a few days.  GARCIA then departed the Chevron driving the white in color GMC Sierra.

121.    After GARCIA left, El Senor told the UCA that he had a shipment of 8 kilograms of heroin that had just arrived, and El Senor offered to sell the UCA heroin at $17,000 per kilogram.  The UCA asked El Senor if he sold the "Blue pills."  El Senor responded that if the UCA wanted any he could send some up

the UCA's way.  El Senor asked if the UCA wanted to buy any heroin.  The UCA told El Senor that he would call him at a later date for a sample.  El Senor advised the UCA that he could get the UCA an ounce sample of heroin within an hour.  Both the UCA and El Senor agreed to this arrangement and decided to meet back at the Chevron in approximately one hour.

122.    Notably, after El Senor and the UCA discussed different types of drugs that the UCA might be interested in distributing, El Senor told the UCA that "he told me you only just move the black."  This is notable in at least two respects: First, as described above, I know based on my discussions with other law enforcement that "the black" is a reference to heroin.  And second, based on my knowledge of this investigation, I believe that the "he" that El Senor was referring to was GARCIA.  The fact that GARCIA had explained to El Senor that the UCA was a drug trafficker involved in the distribution of heroin only further confirms my belief that GARCIA was well aware that when he was sending money to Mexico for the UCA, he was sending money that represented the proceeds of the UCA's purported drug sales.

123.    Later on the same day, the UCA met El Senor at the Chevron.  El Senor arrived in a silver in color Toyota Corolla with an unidentified elderly Hispanic female.  The UCA approached the Toyota and met with El Senor and the unidentified Hispanic female through the front passenger window of the Corolla. El Senor then handed the UCA a clear plastic Ziploc bag containing approximately one ounce of a black, coal-like substance with an oily sheen.  Both the UCA and the investigating DEA agent, who are both trained in drug identification, believed the substance was heroin.  The DEA took custody of this substance for laboratory testing.

124.    After El Senor departed, a San Joaquin County Sheriff's Department Officer pulled over El Senor's Silver Corolla while it was heading southbound on Highway 99.  The driver was observed violating California Vehicle Code 21658,

failure to maintain lane, by going over the fog line while in the number two lane. El Senor was identified by law enforcement as Alberto Ojeda Lopez (Lopez), a resident of Sinaloa, Mexico.  Lopez holds a U.S. Border Crossing Card for a B-1/B-2 Visas (identification number S275509) and a Mexican identification card. The San Joaquin County Sheriff's Department Officer took pictures of the identifications and provided them to federal authorities.

125.   Two days later, on September 18, 2022, MMS messages containing images of wire remittance receipts were sent from GARCIA's phone to the UCA's cellular phone.  The images contained the following transactional data:

| Date | MTCN | Senders Name | Payees Name | Foreign Payout |
|------|------|--------------|-------------|----------------|
| 9/16/2022 | 972-732-5271 | Maria Leticia Gastellum Torres | Antonio Garcia Castaneda | Culiacan, Sinaloa, Mexico |
| 9/16/2022 | 972-712-3183 | Jose Martin Tapia Beltran | Julio Vargas Romero | Culiacan, Sinaloa, Mexico |
| 9/16/2022 | 972-756-1734 | Fidencio Mendoza | Maria Cruz Hinojosa | Culiacan, Sinaloa, Mexico |
| 9/17/2022 | 972-506-8817 | Felipe D Romo Pimentel | Eladio Claudio Mercado | Culiacan, Sinaloa, Mexico |
| 9/17/2022 | 972-249-1263 | Jose Guadalupe Soto Rodriguez | Martha Dominquez Soto | Culiacan, Sinaloa, Mexico |
| 9/17/2022 | 972-289-6683 | Carmen Irene Zayas Salido | Manuel Ortiz Sosto | Culiacan, Sinaloa, Mexico |
| 9/17/2022 | 972-286-0282 | Carmen Irene Zayas Salido | Fabian Flores Guzman | Culiacan, Sinaloa, Mexico |
| 9/18/2022 | 972-055-3540 | German Escutia Ramirez | Eva Mendez Ruiz | Culiacan, Sinaloa, Mexico |
| 9/18/2022 | 972-042-8800 | Gilberto Medina Leon | Ivan Coronel Lopez | Culiacan, Sinaloa, Mexico |

126.   A check of wire transactions by cross-referencing the above listed MTCN transaction numbers from transactional data provided by a Western Union representative revealed that the combined total of the money sent was $17,108. These transactions were structured into four payments per day or less in the amount of $2,000 or less.  This structuring of payments violates the CTR filing requirement for any transaction over $10,000.

127.   Based on the amounts actually sent, the laundering fee for these transactions averaged $99.11 per transaction, which was near GARCIA's quoted

fee of $100 per transaction.[12]   In short, the structuring of the payments and associated laundering fees matched GARCIA's statements during the in-person meeting with the UCA on August 19, 2022.

128.    Based on my training and experience, I believe GARCIA knowingly structured these payments below $10,000 to avoid the CTR reporting requirement.  Furthermore, GARCIA intentionally charged an additional fee to launder money using invented names or customers' names from prior transactions as the sender names to conceal the ownership of the wire remittance transactions.  As a consequence of these actions by GARCIA, the ownership and control of the illegally derived funds in transit were intentionally concealed, and the transaction was not properly reported using a CTR.  Again, both of these actions violated the federal money laundering statutes.

### 9.  GARCIA Participates in Additional Money Laundering Activities on October 7, 2022

129.    On October 7, 2022, the investigative team conducted an undercover operation with the UCA at a Chevron gas station located near GARCIA's residence in the Eastern District of California.  The UCA provided GARCIA with $20,000 in cash, comprised of mixed denominations, including $20 and $100 bills in a yellow plastic bag.  He handed GARCIA a piece of paper containing ten payee names with instructions to send the money to Culiacan, Mexico.

---

[12]  According to a Western Union representative, Western Union charged processing fees for these transactions of $20.00, $20,00, $20.00, $20.00, $20.00, $20.00, $20.00, $11.08, and $20.00, respectively.  The sum of the Western Union fees of $171.08 and GARCIA's additional laundering fees of $720.92 totaled $892.00, which equates to $99.11 per transaction on average.

130.    GARCIA departed the Chevron driving the white in color GMC Sierra pick-up.  GARCIA drove the white in color GMC pick-up to EL RINCONCITO, where he parked on the north side of the business.  The surveillance team monitored GARCIA's activities for a short period at EL RINCONCITO before terminating the operation.

131.    Two days later, on October 9, 2022, multiple MMS messages containing images of wire remittance receipts were sent from GARCIA's phone to the UCA's cellular phone.  The images contained the following transactional data:

| Date | MTCN | Senders Name | Payees Name | Foreign Payout |
|------|------|--------------|-------------|----------------|
| 10/7/2022 | 972-251-6867 | Vanessa A Aguiano Contreras | Julio Vargas Romero | Culiacan, Sinaloa, Mexico |
| 10/7/2022 | 972-291-0223 | Gabriel Sanchez Silva | Maria Cruz Hinojosa | Culiacan, Sinaloa, Mexico |
| 10/7/2022 | 972-378-8729 | Dalia Fernanda Inzunza Araujo | Eladio Claudio Mercado | Culiacan, Sinaloa, Mexico |
| 10/8/2022 | 972-750-0282 | Joel Emanuel Meza | Manuel Ortiz Soto | Culiacan, Sinaloa, Mexico |
| 10/8/2022 | 972-565-5600 | Jose Alfrdo Zazueta Urias | Fabian Flores Guzman | Culiacan, Sinaloa, Mexico |
| 10/9/2022 | 972-938-9491 | Arselia Rios Ruiz | Alberto Cano Castillo | Culiacan, Sinaloa, Mexico |
| 10/9/2022 | 972-876-0686 | Marco Antonio Cortes Benal | Eva Mendez Ruiz | Culiacan, Sinaloa, Mexico |
| 10/9/2022 | 972-899-8405 | Lizbet Ceja Zamora | Ivan Coronel Lopez | Culiacan, Sinaloa, Mexico |

132.    On October 10, 2022, additional MMS messages containing images of wire remittance receipts were sent from GARCIA's phone to the UCA's cellular phone.  The images contained the following transactional data:

| Date | MTCN | Senders Name | Payees Name | Foreign Payout |
|------|------|--------------|-------------|----------------|
| 10/8/2022 | 972-743-4135 | Areli Paulina Larios Almanza | Martha Dominquez Soto | Culiacan, Sinaloa, Mexico |
| 10/7/2022 | 972-249-5371 | Richard Victor Paul Molina | Antonio Garcia Castaneda | Culiacan, Sinaloa, Mexico |

133.    A check of wire transactions by cross-referencing the above listed MTCN transaction numbers from transactional data provided by a Western Union representative revealed that there were nine payments in the amount of $2,000 and one in the amount of $1,000 processed using Western Union services.  The sum of the Western Union fees of $190 and GARCIA's additional laundering fees

Affidavit of Special Agent Brandon Yenter, IRS-CI

of $810 totaled $1,000, which equates to GARCIA's quoted fee of $100 per transaction.

134.   As with the previous transactions, based on my training and experience, I believe GARCIA knowingly structured these payments below $10,000 to avoid the CTR reporting requirement.  Furthermore, GARCIA intentionally charged an additional fee to launder money using invented names or customers' names from prior transactions as the sender names to conceal the ownership of the wire remittance transactions.  As a consequence of these actions by GARCIA, the ownership and control of the illegally derived funds in transit were intentionally concealed, and the transaction was not properly reported using a CTR—which, again, violates the federal money laundering statutes.

135.   In sum, the investigation to date has demonstrated GARCIA's predisposition to launder drug money, as there is probable cause to believe that he knowingly conspired with Valenzuela to launder drug proceeds to Mexico, and that he has engaged in a similar pattern of money laundering dating back to at least April 2018.  GARCIA continued his complicit behavior by laundering money purported to be derived from drug proceeds during multiple sting operations.  GARCIA met with a CS and/or a government agent, both of whom purported to be drug traffickers.  GARCIA specifically arranged for these meetings to happen at an offsite location away from EL RINCONCITO.  And at these meetings, he repeatedly agreed to launder these purported drug traffickers' money.  GARCIA has been regularly trained and counseled by regulators/auditors concerning the $3,000 recordkeeping and CTR filing requirement.  Despite this training, it appears that GARCIA used his AML and BSA training to intentionally structure payments below the $3,000 recordkeeping requirements, while also structuring payments over the course of several days to avoid triggering the CTR filing requirement for any transaction over $10,000.  These funds were concealed using names not associated with the CS and/or government agent.  And in

exchange for these illegal money laundering actions, GARCIA charged the CS and/or UCA an additional fee.

136.    Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that GARCIA laundered monetary instruments in violation of 18 U.S.C. § 1956(a)(3) by concealing the true identities of the senders of the funds.  I also believe GARCIA purposely structured the payments below $3,000 to not trigger the identification and recordkeeping requirements set forth by BSA laws and the Secretary of Treasury.  Moreover, he failed to file CTRs for transactions over $10,000, which are also violations of Section 1956(a)(3).

### D.  Additional Facts Concerning the SUBJECT RESIDENCE – 4600 Tudor Rose Glen, Stockton, CA

137.    Surveillance, undercover activity, and comments made by GARCIA during this investigation, as well as public records I have reviewed reveal that GARCIA resides at 4600 Tudor Rose Glen in Stockton, California.

138.    On or about December 6, 2016, there was a Grant Deed for the property located at 4600 Tudor Rose Glen in Stockton, California, granted to a married woman, Maricela Mesino Gonzalez (Gonzalez).  On or about December 27, 2016, GARCIA conducted an Interspousal Transfer Deed of the property to Gonzalez as the sole owner of the property.

139.    On or about August 17, 2018, an owner builders permit was granted to Gonzalez by the San Joaquin County Community Development Department for the 4600 Tudor Rose Glen address with a final date (believed to be a final inspection date) of October 28, 2020.  The building permit listed the EL RINCONCITO location as the owner's address.  There were subsequent building permits for a pool and detached shade structure with bathroom.  In those

permits, GARCIA's name and initials were used when signing the "OWNER/BUILDER VERIFICATION FORM."

140.    As described in greater detail above, during the undercover sting operations, GARCIA repeatedly traveled to and from the sting from the 4600 Tudor Rose Glen address, and he told the participants that he lived at this address.  The surveillance team observed GARCIA return to his residence after multiple meetings, meaning GARCIA transported money and names written on a piece of paper onto the property's curtilage.

141.    Based on the facts set forth, I believe that GARCIA resides at 4600 Tudor Rose Glen in Stockton, California.  Moreover, I further believe based on the facts learned in this investigation, as well as my training and experience described elsewhere in this affidavit, that GARCIA maintains and stores evidence of his crimes related to money laundering at that address.

**E.  Additional Facts Concerning GARCIA's Assets**

142.    Based on my training and experience, and after talking to other law enforcement officers, I know that individuals involved with illicit activity like that at issue in this case (i.e., laundering of drug proceeds) typically attempt to conceal and/or disguise the true ownership of their assets by, among other things, using nominees.  The use of nominees regarding the ownership of assets is a common technique used by those engaged in illicit activity to attempt to confuse law enforcement and to protect these assets from criminal and/or administrative forfeiture.

143.    During this investigation, I have learned several facts indicating that GARCIA has made multiple affirmative acts to move assets into the name of his wife—Maricela Mesino Gonzalez—which appear to be acts consistent with the

just-described practice of "transferring" ownership of assets in order to conceal the assets' true ownership.  For example:

1. On February 16, 2012, GARCIA was removed as the EL RINCOCITO real property owner located at 301 E. Pine Street in Lodi, California.  According to a ten-year title report, the grantees of the property were listed as Patricia Garcia (believed to be GARCIA's former spouse) and Gonzalez in exchange for just $1.00.

2. On December 6, 2016, the deed to the (at the time) unimproved land located at "4600 Tudor Rose Road" [sic] in Stockton, California was transferred into Gonzalez's name.  Moreover, on December 27, 2016, GARCIA signed a notarized interspousal transfer deed, which gave Gonzalez full ownership of the property.

3. Multiple San Joaquin County Community Development Department Building Permits related to the 4600 Tudor Rose property listed "GONZALEZ, MARICELA MESINO" as the property owner. However, a San Joaquin County Community Development Department "OWNER/BUILDER VERIFICATION FORM" dated September 7, 2020 listed GARCIA as the owner of the same property.  This form also included GARCIA's phone number, and it contained a signature that appears belong to GARCIA.

4. The construction payments for the residence located at 4600 Tudor Rose Glen were traceable to bank accounts held in Gonzalez's name.  However, near the timeframe of the construction of the residence, Gonzalez's bank accounts received high-value cash and/or check deposits.  Many of the deposited checks were from

the EL RINCONCITO business bank account, and thus I believe these deposits were derived from the EL RINCONCITO business.

5.  A subpoena return from MoneyGram indicates that GARCIA completed and signed a Form W-9, Request for Taxpayer Identification and Certification, as the sole owner of EL RINCONCITO on September 28, 2006.  However, a January 5, 2018 Western Union "Know Your Agent (KYA) Questionnaire" listed Gonzalez as a 50 percent owner of EL RINCONCITO.

144.    According to comments made by GARCIA during the undercover operations, and based on the facts set forth above, I believe GARCIA owns the properties and assets listed above.  Moreover, I believe GARCIA intentionally has moved assets into Gonzalez's name in an attempt to disguise the ownership of the EL RINCONCITO business and real property and the 4600 Rose Tudor Glen real property.  Furthermore, I believe GARCIA and/or Gonzalez intentionally took funds and checks derived from the EL RINCONCITO business and deposited those funds and checks into bank accounts in Gonzalez's name. These same funds were then used to construct the residence in Gonzalez's name, which—again—is consistent with acts intended to conceal the true ownership of the property.

## VI.  TECHNICAL TERMS

145.    Based on my training and experience, and after consulting with other law enforcement officers, I use the following technical terms to convey the following meanings:

1.  IP Address:  The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. Typically, an IP address looks like a series of four numbers, each in

the range 0-255, separated by periods (e.g., 121.56.97.178). Other forms of IP addresses, such as IPv6, may express IP addresses differently. Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

2. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

3. Storage medium: A storage medium is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media

**VII. COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

146. As described above and in Attachment B, this application seeks permission to search for records that might be found on the subject premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

147.   *Probable cause.*  I submit that if a computer or storage medium is found on the subject premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media— in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e.  Based on actual inspection of other evidence related to this investigation, including the MMS messages showing pictures of wire transaction receipts generated by computers at the EL RINCONCITO business, I am aware that computer equipment was used to generate, store, and/or print documents used in the money laundering scheme.  As a result, there is reason to believe that there is a computer system currently located on the premises that are listed as the subjects of the present request for a search warrant.

148.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the subject premises because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of

peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.

Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

149.    *Necessity of seizing or copying entire computers or storage media*.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.

Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

150.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

151.  Because several people share one of the subject premises as a residence, it is possible that the subject premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things

described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

152.   EL RINCONCITO ("the Company") is a functioning company that appears to conduct legitimate business in addition to its illicit money laundering activities. The seizure of the Company's computers may limit the Company's ability to conduct its legitimate business.  As with any search warrant, I expect that this warrant will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.  Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.  If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## VIII.   <u>SEALING REQUEST</u>

153.   The criminal investigation regarding GARCIA and others is continuing.  A number of additional interviews, subpoenas, and possibly grand jury testimony and search warrants are contemplated in the very near future.  Disclosure of the contents of this affidavit at this time would seriously impede the continuing investigation and prosecution by disclosing the details of the Government's investigation, which potentially would cause target(s)/subject(s) of the investigation to flee, destroy evidence, or intimidate and attempt to corruptly influence potential witnesses in the case.  Such activity would seriously impede the investigation and prosecution.  Accordingly, the Court is respectfully

requested to issue an order sealing this warrant application, affidavit, complaint, and accompanying documents until further order of this Court.

[NOTHING FOLLOWS ON THIS PAGE]

Affidavit of Special Agent Brandon Yenter, IRS-CI

## IX.  **CONCLUSION**

154.    Based on all of the facts and circumstances described in this affidavit, along with my training, experience, and consultations with others, I submit that there is probable cause to believe that the items described in Attachment B are currently located at the premises described in Attachments A-1 through A-4, and that those items constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 1956(h) (Money Laundering Conspiracy) and 18 U.S.C. § 1956(a)(3) (Money Laundering Sting).

155.    Finally, I submit that there is probable cause to issue a criminal complaint and arrest warrant charging GARCIA with violations of 18 U.S.C. § 1956(a)(3) (Money Laundering Sting Provision).

/s/ Brandon M. Yenter

BRANDON M. YENTER
Special Agent
Internal Revenue Service-Criminal Investigation

Subscribed and sworn to me telephonically
this __23__ day of February, 2023.

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

Reviewed and approved as to form

AARON D. PENNEKAMP
Assistant United States Attorney

Affidavit of Special Agent Brandon Yenter, IRS-CI

**ATTACHMENT A-1**
**DESCRIPTION OF PROPERTY TO BE SEARCHED**

**4600 Tudor Rose Glen, Stockton, CA**

The residence of Ramon GARCIA is located at 4600 Tudor Rose Glen, Stockton, CA. This residence is located on the southeast of a T-intersection on 99 Frontage Road and Tudor Rose Glen.  The northside of the property (front) has a pedestal stucco wall with a steel ornamental fence and two gates leading to the driveway.  There are two concrete driveways oriented on both sides of the residence, which also lead to a drive-through portico.  The residence can be described as a two-story building with a light and dark gray color stucco façade.  There are two balconies, one on each side of the front of the home, with sliding glass doors.  Below the balcony is an additional window on the first story.



The requested search shall include any associated rooms, locked containers, storage rooms, trash containers, other containers, and safes associated with the residence.

**ATTACHMENT A-2**
**DESCRIPTION OF PROPERTY TO BE SEARCHED**

### 301 E. Pine Street, Lodi, CA

EL RINCONCITO, Incorporated is located at 301 E. Pine Street, Lodi, California. The premises is on the northeast corner of the intersection of E. Pine Street and N. Washington Street.  This one-story building is constructed with green and tan in color masonry walls with a metal roof.  The southside of the building has a row of service windows with an "EL RICONCITO" sign with red background and white lettering mounted on the roof.  The entrance to the business is located on the north side or rear of the structure.



The requested search shall include any associated rooms, locked containers, storage rooms, trash containers, other containers, and safes associated with the premises.

**ATTACHMENT A-3**
**DESCRIPTION OF PROPERTY TO BE SEARCHED**

<u>**Cellular Phone Assigned Call Number (209) 430-2095**</u>

The cellular phone to be searched is subscribed in the name "EL RINCONCITO INC" with an address of 16 N. Central Avenue, Lodi, California.  The cellular phone carrier is T-Mobile USA and can be identified by the phone number (209) 430-2095.

**ATTACHMENT A-4**
**DESCRIPTION OF PROPERTY TO BE SEARCHED**

**GMC Sierra with CA License Plate Number 31408R1**

The vehicle to be searched is a 2014, white in color GMC Sierra.  This vehicle can be identified by its California license plate number 31408R1 or vehicle identification number 3GTP1TEC2EG538654.



The requested search shall include any locked containers, storage containers, trash containers, other containers, and safes associated with the vehicle.

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

The items to be searched and seized from the locations described in Attachments A-1, A-2, A-3, and A-4 include evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1956(a)(2)(B)(i) (International Money Laundering), 18 U.S.C. § 1956(a)(3) (Money Laundering Sting Provision), and/or 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) committed by Ramon GARCIA and/or his co-conspirators from April 2018 to the present, specifically identified as follows:

1. Documents, records, or correspondence to and/or from actual or prospective customers reflecting communications with and the operations of drug traffickers.

2. Records and/or documents evidencing dominion and control over the premises to be searched.

3. Records and/or documents evidencing the identity of individuals occupying or utilizing the premises to be searched.

4. Diaries, calendars (whether conventional or electronic), appointment books, Journals, address/telephone books (such as an address/telephone rolodex or similar index), and business cards associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

5. Customer files and lists associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering, which are related to the check cashing and/or transfer or transmission of money, including records with the following types of information: customer names, addresses, and phone numbers; amount of money transferred; type of check cashed; check payee and payor information (e.g., name, address, social security number, telephone number and driver's license number); commission or payments received from customers related thereto.

6. Compliance training records, training of employees on SARs, CTRs and BSA requirements, internal audit files, internal investigation files, training records on AML, and any wire service agent onboarding due diligence documentation.

7. Sender's money transfer receipts (to include any sender's name, address, telephone number, social security number, date sent, amount sent, fee charged, expected payout location and the recipient's name), recipient's money transfer receipts (to include any recipient's name, address, telephone number, social security number and amount received), to include any identification used to send wires.

8. Bank records, credit card account records, brokerage account records, investment records, financial institution records, and any other records reflecting the potential receipt of income, transfer of assets, or expenditure of income, documents related to the ownership or purchase of real property, documents relating to the purchase of durable goods or luxury items with a value in excess of $750, including vehicles, jewelry and appliances which are

associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

9. Records or keys related to the use of any safe deposit boxes.

10. Documents or records of financial transactions or instruments, travelers checks, bonds, stock certificates, wire transfers, money orders, cashier's checks, passbooks, bank checks, bank statements, credit card statements, bank deposit tickets, certificates of deposits, income tax returns, memoranda, and money counting machines, which are associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

11. Photographs, videos, and any video or audio recordings pertaining to assets obtained with narcotics proceeds.

12. Cellular telephones and other electronic communication devices that could be used to conspire to, or otherwise engage in, money laundering.  Specifically, this includes records of telephone calls, text messages, WhatsApp messages, SMS messages, picture messages, electronic messages, application information, and voicemails stored within the device, contact lists and phonebook, recent call activity, electronically formatted personal notes, photographic or video images, audio recordings, or records of appointments and/or reminders annotated on a calendar relating to the above-mentioned violations.

13. Computers, electronic devices such as tablets, and electronic storage devices that could be used to launder money or to store records reflecting the laundering of monetary instruments.

14. Records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over the premises or digital media found in the premises, specifically, personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties, keys, or photographs (developed or undeveloped).

15. Personal telephone and address books and listings, letters, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, shipping materials or records, which are associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

16. Records accounting for the remittance of drug proceeds, for example, accounting books, receipts, purchase orders, notes, ledgers, notebooks, computer spreadsheets, and "pay/owe sheets."

17. Any cash or monetary instrument exceeding $2,000 in value located on the curtilage of 4600 Tudor Rose Glen, Stockton, California, which is the property more particularly described in Attachment A-1. This includes cash or monetary instruments found

in any structure, container, safe, or other storage device located in or on the residence's curtilage.

18. Originals or copies of Form 1040, U.S. Individual Income Tax Return, for GARCIA and/or Maricela Mesino Gonzalez; Form 1120, U.S. Corporation Income Tax Return, or Form 1120S, U.S. Income Tax Return for an S Corporation, for EL RINCONCITO, Inc. with all related forms, schedules, and attachments.

19. Complete tax files for GARCIA, Maricela Mesino Gonzalez, and/or EL RINCONCITO, Inc.  Tax files typically include: tax preparation records, organizers, questionnaires, sheets, work-papers, ledgers, schedules, statements, bank statements, other bank information, journals, check registers, forms, summaries, commission logs, payment logs, receipt books, correspondence, notices, notes, planners, or any other documentation relating to the preparation of original, amended, or subsequent audit of income tax and partnership returns and records.

20. Written correspondence to and from the Internal Revenue Service relating to the specific returns and records and returns referred to in subparagraphs (18) and (19) above and related to the money service business.

21. All bookkeeping records for GARCIA, Maricela Mesino Gonzalez, and/or EL RINCONCITO, Inc.  Bookkeeping records typically include: general ledger, general journals, all subsidiary ledgers and journals, gross receipts and income records, cash receipts and disbursement records and/or journals, sales and purchase records and/or journals, commission checks, commissions letters, sales letters, accounts receivable and payable ledgers and records, bad debt records, cost of goods sold records, loan receivable and payable ledgers, balance sheet, income statement, records of assets purchased, and voucher register.

22. All banking records for GARCIA, Maricela Mesino Gonzalez, and/or EL RINCONCITO, Inc.  Banking records typically include: account and payment intermediary processor records including passbooks or statements, records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, records reflecting the identity of checks deposited, withdrawal slips, records disclosing the disposition of withdrawals, and records revealing the identity of checks drawn on the account, cancelled checks issued from account, and Forms 1099 issued.  Records of any credit card accounts or similar credit devices, safe deposit boxes, certificates of deposit, money market certificates, U.S. Treasury Notes or Bills purchased.

23. Indicia of ownership or indicia of control of assets, including real and personal property owned or controlled.  Lists of assets owned or controlled, including such information as purchase and sale date, purchase and sale amount, purchase and sale agreements, receipts issued for down payments, deposits, or other exchange of funds, copies of any checks, mortgage records, loan contracts, checks issued for loans, repayment records, name on title, car registration seller name, use of asset, and sale date if applicable.  Receipts or other records of purchasing for acquisition of personal property valued over $1,000.  All correspondence papers, or other files relating to the purchase or sale or ownership or control of real or personal property.

24. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

25. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

26. The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

27. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**PENALTY SLIP –**

**RAMON ROBLEDO GARCIA**

**_____ADP_____**
AUSA Initial


VIOLATION:       18 U.S.C. § 1956(a)(3) – Money Laundering Sting Provision

PENALTY:         20 years maximum term of imprisonment
                 $250,000 fine, or a fine of twice the gross gain or gross loss
                 resulting from the offense, whichever is greatest
                 3 years supervised release
                 $100 special assessment

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>A Western Digital hard drive with serial number WMC4MOFO9P5J (forensic image), CURRENTLY LOCATED AT the IRS-CI Oakland Field Office, located at 1301 Clay Street, Oakland, California | )<br>)<br>)  Case No.    2:23-sw-0298 DB<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-4, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ April 7, 2023 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐   Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐  for _____ days *(not to exceed 30)*  ☐  until, the facts justifying, the later specific date of _____ .

Date and time issued:      03/24/2023, 4:00pm _____

City and state:      Sacramento, California _____

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____

| | |
|---|---|
| _____<br>Signature of Judge | Date |

## ATTACHMENT A-4

**DESCRIPTION OF PROPERTY TO BE SEARCHED**

A Western Digital hard drive with serial number WMC4MOFO9P5J (forensic image), which was seized at EL RINCONCITO on February 28, 2023, hereinafter the "Device." This item is currently located at IRS-CI Oakland Field Office, located at 1301 Clay Street, Oakland, California.


This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

## **ITEMS TO BE SEIZED**

The items to be searched and seized from the property described in Attachments A-1, A-2, A-3, and A-4 include evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1956(a)(2)(B)(i) (International Money Laundering), 18 U.S.C. § 1956(a)(3) (Money Laundering Sting Provision), and/or 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) committed by Ramon Robledo GARCIA and/or his co-conspirators from April 2018 to the present, specifically identified as follows:

1. Electronic documents, records, or correspondence to and/or from actual or prospective customers reflecting communications with, and the operations of, drug traffickers.

3. Electronic diaries, calendars (whether conventional or electronic), appointment books, journals address/telephone books (such as an address/telephone rolodex or similar index), and business cards associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

4. Customer files and lists associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering, which are related to the check cashing and/or transfer or transmission of money, including records with the following types of information: customer names, addresses, and phone numbers; amount of money transferred; type of check cashed; check payee and payor information (e.g., name, address, social security number, telephone number and driver's license number); commission or payments received from customers related thereto.

5. Compliance training records, training of employees on SAR, CTRs and BSA requirements, internal audit files, internal investigation files, training records on AML, and any wire service agent onboarding due diligence documentation.

6. Sender's money transfer receipt (to include any sender's name, address, telephone number, social security number, date sent, amount sent, fee charged, expected payout location and the recipient's name), recipient's money transfer receipt (to include any recipient's name, address, telephone number, social security number and amount received), to include any identification used to send wires.

7. Bank records, credit card account records, brokerage account records, investment records, financial institution records and any other records reflecting the potential receipt of income, transfer of assets or expenditure of income, documents related to the ownership or purchase of real property, documents relating to the purchase of durable goods or luxury items, including vehicles, jewelry and appliances which are associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

8. Electronic records or keys related to the use of any safe deposit boxes.

9. Electronic documents or records of financial transactions or instruments, travelers' checks, bonds, stock certificates, wire transfers, money orders, cashier's checks, passbooks, bank checks, bank statements, credit card statements, bank deposit tickets, certificates of deposits, income tax returns, memoranda, and other records which are associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

11. Photographs, videos, and any video or audio recordings pertaining to assets obtained with narcotics proceeds.

12. Electronic records, documents, and materials showing control, possession, custody, dominion, or other indicia of occupancy over the premises or digital media found in the premises, specifically, personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties, keys, or photographs (developed or undeveloped).

13. Personal telephone and address books and listings, letters, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, shipping materials or records, which are associated with or pertaining to members of a drug trafficking organization and/or persons associated with trafficking in controlled substances or money laundering.

14. Records accounting for the remittance of drug proceeds, for example, accounting books, receipts, purchase orders, notes, ledgers, notebooks, computer spreadsheets, and "pay/owe sheets".

15. Electronic communications devices relating to any conspiracy to launder money or money laundering activities.  Specifically, this includes records of telephone calls, text messages, WhatsApp messages, SMS messages, picture messages, electronic messages, application information, and voicemails stored within the electronic device, contact lists and phonebook, recent call activity, electronically formatted personal notes, photographic or video images, audio recordings, or records of appointments and/or reminders annotated on a calendar relating to the above-mentioned violations.

16. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.